312 Ga. 537
FINAL COPY

S21A0787.  LEWIS v. THE STATE.

COLVIN, Justice.

Following a jury trial, Appellant Brian David Lewis was convicted of malice murder and concealing the death of another in connection with the beating death of Ronald Redding.[1]  Appellant claims that the evidence presented at his trial was insufficient to support his murder conviction, that the trial court erred by failing

[1] On April 12, 2017, a Chatham County grand jury indicted Appellant for malice murder (Count 1); felony murder predicated on aggravated battery, aggravated assault, and elder abuse (Counts 2, 3, and 4); aggravated battery family violence (Count 5); aggravated assault family violence (Count 6); exploitation and intimidation of a disabled adult, elder person, or resident (Count 7); and concealing the death of another (Count 8).  At a jury trial held from October 15 through 18, 2018, Appellant was found guilty of all charges.  Appellant was sentenced to life in prison for malice murder and ten years consecutive for concealing the death of another.  All remaining counts were either merged or vacated by operation of law for sentencing purposes.  Appellant timely filed a motion for new trial on October 22, 2018, which he amended on April 4, 2019.  After holding two hearings, the trial court denied the motion as amended on February 4, 2021.  Appellant timely filed a notice of appeal.  The appeal was docketed to the April 2021 term of this Court and submitted for a decision on the briefs.

to charge the jury on voluntary manslaughter, that he was denied constitutionally effective assistance of counsel, and that the cumulative effect of trial counsel's errors prejudiced him. For the reasons set forth below, we affirm.

1. Appellant contends that the evidence presented at trial was constitutionally insufficient to sustain his murder conviction.[2] When evaluating the sufficiency of evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight

---

[2] Appellant does not challenge the sufficiency of the evidence concerning his conviction for concealing the death of another, and this Court no longer routinely reviews the sufficiency of the evidence sua sponte in non-death penalty cases. See *Davenport v. State*, 309 Ga. 385, 391-392 (4) (846 SE2d 83) (2020).

and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

Viewed in this light, the evidence presented at trial showed that, at all relevant times, Appellant and his wife Stephanie Lewis lived with Stephanie's 66-year-old father, Redding, at a house in Chatham County. The relationship between the three was volatile and abusive. Katie Everette Craft, Redding's granddaughter, testified at trial that the living situation in the house between Redding, Appellant, and Stephanie was "toxic." On the morning of Redding's death, Redding told Craft that he was planning to evict Appellant and Stephanie from the house, that "he was in fear for his life," and "that he was going to kill [Appellant] before [Appellant] killed him." Jordan Tyler Everette, Redding's grandson, testified that Redding, Appellant, and Stephanie "were all really on medication" and that "drugs consumed" Appellant. He also testified that Appellant once called him and asked whether muriatic acid would dissolve a human body. Both Craft and Everette detailed the tumultuous relationship between Appellant, Redding, and

3

Stephanie, which included both death threats and actual acts of violence against each other.

On October 13, 2016, the day before Redding's death, law enforcement officers responded to two separate 911 calls regarding domestic incidents between Appellant, Redding, and Stephanie. Officers testified that they had been called out to the Redding residence on numerous prior occasions in response to domestic incidents between Appellant, Redding, and Stephanie. During one of the response calls on October 13, Redding informed the responding officer that Appellant was stealing Redding's medications and accused Appellant of throwing a lamp at him. Redding also informed the responding officer that he was in the process of having Appellant and Stephanie evicted from the house.

On January 20, 2017, law enforcement officers arrived at Redding's home for a welfare check. Stephanie allowed officers to search the residence and a shed on the property. During their search of the residence, officers found various pill bottles, a summons to magistrate court for an eviction proceeding filed by

4

Redding against Appellant, and a receipt from a home improvement store, dated January 12, 2017, at approximately 7:20 p.m., for two gallons of muriatic acid. In the shed, officers found a roll of plastic wrap, two unopened jugs containing muriatic acid, and a 50-gallon drum trash can wrapped in multiple layers of duct tape and plastic wrap. Inside that trash can, officers located Redding's decomposing body, a black trash bag, five bottles of bleach, a baseball bat, a shower pole, a towel, and other miscellaneous trash.

Appellant was immediately arrested and, during a search incident to arrest, officers discovered Appellant's wallet, which contained a note stating the following:

> To all y'all bastards that hate me and have been trying to get rid of me for years, congrats! Y'all did it! I'm dead! Throw a party! I killed Ron Redding. He tried to stab my wife and then he tried to stab me. I didn't do it on purpose. He lunged at me with a knife and because of natural reaction I hit him and he tripped on the front porch mat and fell and hit his head on the threshold at the front door. I panic[k]ed and lied to my wife and told her that he went to the mountains. She isn't responsible in any way. She found out about it but was afraid for her safety so she didn't turn me in because of fear of losing her life. I love Stephanie and would never hurt her and even though he tried to kill her and many other women, I

5

didn't want him to die. He told me, Stephanie, and several people that he hated me and was going to kill me but I am still so sorry and ashamed that it happened. I hope God and Stephanie will forgive me. I am solely responsible for his death. Stephanie has tried to turn me in several times but I scare her each time so she doesn't tell on me to protect herself.

During his interview with law enforcement officers, Appellant admitted that he wrote the letter found in his wallet and stated that the incident described in the letter occurred on October 14, 2016.

Subsequent investigation revealed a surveillance video showing Appellant carrying two bottles of muriatic acid to the checkout counter of a home improvement store, the date and time of which corresponded with the receipt officers located inside Redding's house. An autopsy revealed that Redding died from multiple blows to the head with a blunt instrument. While the external examination of Redding's body revealed five injuries to the back of the head and two to his eyes, an internal examination revealed evidence of eighteen injuries, including numerous rib, skull, and spine fractures and some dislocated joints. The medical examiner opined at trial that Redding's injuries were consistent

6

with his being struck with a blunt force object, like a baseball bat, numerous times, and were not consistent with a single fall or being punched with a fist.

Appellant testified at trial and gave the following account of the incident. The initial confrontation took place on the front porch of the home on the morning of October 14, 2016. Redding told Appellant to pack up and leave before turning to go back inside. When Redding had trouble opening the front door, Appellant came up behind him and reached around Redding to open the door, at which point Redding pulled a knife from his bathrobe and tried to stab Appellant. Appellant then punched Redding in the face with his fist, which caused Redding to drop the knife. Redding then picked up the knife and moved toward Appellant, at which point Redding tripped, hit his head on the door threshold, went into convulsions, and never got back up. Appellant subsequently pulled Redding inside the home and checked on Stephanie to ensure she would not see her father in an injured state. After unsuccessfully attempting to administer CPR, Appellant placed Redding's body in

a wheeled trashcan and moved the trash can onto the carport next to the house.

Appellant testified that he was arrested on an unrelated charge that evening and, after spending four days in jail, he returned to the house and noticed that the trash can was starting to smell. He wrapped the trash can in plastic wrap and moved it from the carport into the shed behind the house. Appellant also admitted that he wrote checks to himself from Redding's bank account after Redding's death and continued to use Redding's credit cards after his death to purchase takeout food. Additionally, he testified that he purchased the bottles of muriatic acid and that he taped the trash can containing Redding's body because he did not want anyone to find the body.[3] Appellant maintained that he acted in self-defense.

Appellant alleges that the evidence was insufficient to support

---

[3] Appellant told the jury he bought the acid to clean the front steps of a rental property the family owned. He also denied using the baseball bat to beat Redding, explaining that, as he placed Redding's body into the trash can, the bat and shower rod fell in front of the door, blocking his route out of the house. Appellant testified that he picked up the bat and shower rod and stuck them into the trash can to get them out of his way.

his murder conviction because the State failed to disprove his claim of self-defense beyond a reasonable doubt. However, based on the evidence presented at trial and recounted above, the jury was authorized to reject Appellant's theory of self-defense and find him guilty beyond a reasonable doubt of murder. See *Jackson*, 443 U. S. at 319 (III) (B). See also *Morris v. State*, 301 Ga. 702, 705 (1) (b) (804 SE2d 42) (2017) (reiterating that "questions about the existence of justification are for the jury to resolve. The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the [killing] was not done in self-defense") (citation and punctuation omitted). Accordingly, the evidence was sufficient to support Appellant's murder conviction.

2. Appellant argues that the trial court erred by failing to instruct the jury on voluntary manslaughter. The record shows that, prior to trial, both the State and the defense filed a written request to charge the jury on voluntary manslaughter. During the charge conference, the trial court indicated that it was willing to instruct the jury on voluntary manslaughter; however, defense

counsel withdrew the requested charge. Appellant confirmed to the trial court that he had reviewed the matter with his counsel and agreed to the withdrawal of the voluntary manslaughter charge. The State urged the trial court to give the charge, arguing that Appellant's own testimony supported the instruction. Defense counsel argued that Appellant's trial testimony did not, in fact, support a charge on voluntary manslaughter, and the trial court opted not to give the charge. Now, on appeal, Appellant alleges that the trial court erred in failing to give the instruction. Because there was no objection by Appellant in the trial court, this claim can be reviewed only for plain error.

As this Court has previously explained:

> We may remedy an error under plain error review if (1) the error was not affirmatively waived by the appellant; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

(Citation omitted.) *Williams v. State*, 302 Ga. 147, 151-152 (2) (805 SE2d 873) (2017). Here, Appellant cannot satisfy the first prong of

the plain error test because he affirmatively waived the alleged trial court error. "To constitute an affirmative waiver, an error must have been 'intentionally relinquished or abandoned.'" *Davis v. State*, 311 Ga. 225, 230 (2) (857 SE2d 207) (2021) (quoting *State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011)). Not only did trial counsel withdraw the requested charge on voluntary manslaughter with Appellant's agreement, but she also affirmatively opposed the instruction during the charge conference. Consequently, Appellant cannot show plain error as he intentionally relinquished the alleged error for which he now seeks relief on appeal. See *Cheddersingh v. State*, 290 Ga. 680, 684 (2) (724 SE2d 366) (2012) (explaining that affirmative waiver, as opposed to mere forfeiture by failing to object, prevents a finding of plain error).[4]

---

[4] Appellant also raises a claim of ineffective assistance of counsel regarding counsel's withdrawal of the requested voluntary manslaughter charge. Specifically, Appellant alleges that his agreement to withdraw the charge was based upon inadequate legal advice from his trial counsel, in that counsel failed to properly explain the parole ramifications of a conviction for voluntary manslaughter. Appellant did not raise this issue in his amended motion for new trial and he did not argue it in his post-hearing brief; however, he did raise this claim at the hearing on his motion for new trial, and the parties presented argument to the trial court. Still, the trial court did not issue

11

3. Appellant alleges that he received ineffective assistance of trial counsel based upon counsel's failure to: (a) adequately investigate, prepare, and present Appellant's theory of self-defense; (b) timely advise Appellant of a guilty plea offer and to explain the consequences of a plea or trial, including differences in parole eligibility; and (c) explain the option for a bench trial. In order to establish constitutionally ineffective assistance, a defendant must show that his counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. See

a ruling on this claim of ineffective assistance of counsel. Based on the foregoing, this issue is not preserved for appellate review. See *Rickman v. State*, 304 Ga. 61, 66 (3) (816 SE2d 4) (2018) ("[A]lthough a trial court may under some circumstances allow a motion for new trial to be amended implicitly by treating a claim as if it had been raised in the motion, the trial court's failure to address any ineffectiveness claim in its ruling on the motion for new trial indicates an absence of any such amendment, and this means that, even though there was questioning on the issue at the hearing on the motion, there is no ruling on the issue for this Court to review." (Citation and punctuation omitted.)); *Prince v. State*, 295 Ga. 788, 793 (2) (b) (764 SE2d 362) (2014) (claim of ineffective assistance not preserved where defendant failed to raise the issue in his amended motion for new trial, failed to raise the claim at the hearing on that motion, and failed to obtain a ruling on it from the trial court).

*Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If the defendant fails to satisfy either prong of the *Strickland* test, this Court is not required to examine the other. See *Green v. State*, 291 Ga. 579, 580 (2) (731 SE2d 359) (2012).

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." (Citation omitted.) *Harrington v. Richter*, 562 U. S. 86, 104 (IV) (131 SCt 770, 178 LE2d 624) (2011). Indeed, "[t]rial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014). "In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012). With these

principles in mind, we review Appellant's claims of ineffective assistance.

(a) *Trial claims.*

Appellant claims that trial counsel failed to adequately investigate, prepare, and present at trial Appellant's theory of self-defense in that she (i) failed to obtain and review all of the evidence in his case and spend sufficient time consulting with him prior to trial, (ii) failed to procure and present the testimony of Stephanie Lewis at trial, (iii) failed to present the recorded 911 calls from the day before Redding's death in order to corroborate Appellant's self-defense claim, and (iv) failed to present evidence from recordings seized from Appellant's home that purportedly included previous threats made by Redding. Based on the record before this Court, however, Appellant has failed to meet his burden under *Strickland* on any of these claims.

(i) *Trial preparation.*

Appellant alleges that trial counsel failed to obtain and review all of the evidence in his case and spent an inadequate amount of

time consulting with him prior to trial. At the motion for new trial hearing, both William Lewis,[5] Appellant's pre-trial attorney, and Katherine Kelly, Appellant's trial attorney, provided testimony regarding their representation. William Lewis testified concerning his representation of Appellant during the early stages of the case. After pre-trial counsel transferred to another division within the public defender's office, Appellant's case was re-assigned to Kelly. Kelly testified that, when she took over Appellant's representation, she reviewed the case file, had discussions with Appellant concerning his case, made investigative requests, had an investigator contact all members of Appellant's family, met with pre-trial counsel and reviewed all of his notes from his work on the case, went to the District Attorney's office and reviewed the entire case file, and spent "hours and hours of preparation, obviously, going through everything and the statements and transcribing the statements, speaking to the witnesses."

The trial court credited Kelly's testimony in support of its

---

[5] Appellant is not related to pre-trial counsel Lewis.

determination that counsel was not deficient in her trial preparation. Giving the proper deference to the trial court's factual findings and credibility determinations, we conclude that Appellant has failed to show deficient performance under *Strickland*. See *Jones v. State*, 287 Ga. 270, 272 (695 SE2d 271) (2010) ("The trial court was authorized to credit the testimony of [appellant's trial] counsel, and its factual findings and credibility determinations will be accepted unless clearly erroneous." (Citation and punctuation omitted.)); *Ruffin v. State*, 283 Ga. 87, 91 (12) (d) (656 SE2d 140) (2008) ("Appellant's claim that counsel spent inadequate time conferring with him is not dispositive, as there exists no magic amount of time which counsel must spend in actual conference with his client." (Citation and punctuation omitted.)).

(ii) *Testimony of Stephanie Lewis.*

Appellant contends that trial counsel was ineffective because she failed to procure and present the testimony of Stephanie Lewis at trial. At the motion for new trial hearing, trial counsel testified that she believed Stephanie's testimony to be important to the case

16

and, because of that, she did attempt to subpoena Stephanie and call her as a witness at trial. However, though Stephanie was initially cooperative with the defense team, trial counsel explained that, when it came to appearing to testify at trial,

> [Stephanie] would not accept service. She was cooperative with my office, with me and my investigators, and with my assistant up and to a point, and then she was outside the area where she could be served personally. So, we mailed it. She didn't sign for it. We FedEx'd it. She didn't sign for it. We attempted to contact her. She wouldn't take our phone calls, which was unusual, because up until that point, she had been very cooperative and indicated to us that she would come to testify.

Appellant called Stephanie as a witness at the motion for new trial hearing. She testified about the events surrounding the 911 calls made on October 13, 2016. She also testified that, at the time of her father's death, she was suffering from psychosis and on both antidepressants and antipsychotic medication, although she was not taking them as prescribed because she could not afford the medications. She further testified that she did not witness the murder and that, when Appellant told her how her father died, she, "didn't believe it to be true. I thought that — I don't know. I just —

17

I just didn't believe it was true." Appellant did not ask, and Stephanie did not testify, about whether she was available to testify at trial or whether she would have accepted service of the defense's subpoena.

In its order denying this claim of ineffective assistance of counsel, the trial court credited trial counsel's testimony concerning her attempts to serve Stephanie, finding that the defense team "did everything they could to subpoena Mrs. Lewis and force her to appear at trial; however, they were unable to serve her with a subpoena to appear." The court further concluded that, even if trial counsel had procured Stephanie's attendance at trial, her testimony would not have produced a different result at trial because of issues surrounding her mental state at the time of the murder and because her testimony would not have been helpful to the defense.

We agree with the trial court that Appellant has failed to show that trial counsel was ineffective under *Strickland*. First, the record shows that trial counsel made many attempts to subpoena Stephanie to testify at trial, but she was elusive and uncooperative.

18

Moreover, had Stephanie testified at trial, her testimony would have either been cumulative of other evidence presented at trial regarding the events of October 13, 2016, see *Wesley v. State*, 286 Ga. 355, 358 (3) (h) (689 SE2d 280) (2010) (no showing of prejudice on allegation that trial counsel was ineffective for failing to present additional corroborative evidence of victim's status as a drug dealer where the additional evidence was cumulative of extensive testimony already admitted at trial), or it would not have been helpful to the defense, see *Hudson v. State*, 284 Ga. 595, 598 (5) (a) (669 SE2d 94) (2008) (counsel's failure to call a witness at trial did not prejudice defendant where the motion for new trial court concluded that the witness had credibility problems and that his testimony would not have been helpful to the defense). Accordingly, this claim fails.

(iii) *911 recordings.*

Appellant alleges that trial counsel was ineffective for failing to present the recorded 911 calls from October 13, 2016, to

corroborate Appellant's self-defense claim.[6]  At the motion for new trial hearing, counsel explained that she made the strategic decision not to introduce the 911 calls themselves because she "did not feel it was necessary to play that. There — we had testimony about the 911 call and the responding officer, and also about the threats that were made."  The trial court credited counsel's testimony and concluded that counsel made a reasonable strategic decision to not introduce the 911 calls.  We agree with the trial court's conclusion.  See *McNair*, 296 Ga. at 184 ("Trial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them."  (Citation and punctuation omitted.)).  Indeed,

> [w]hile other counsel, had they represented appellant, may have exercised different judgment, the fact that trial counsel chose to try the case in the manner in which it was tried, and made certain difficult decisions regarding

[6] Appellant played the two 911 calls at the hearing on his motion for new trial.  The first 911 call was placed by Redding wherein he told the dispatcher that Appellant was throwing things and had just threatened to kill him, that Appellant was in the house illegally, and that officers needed to come remove Appellant from the home.  The second 911 call was placed by Stephanie wherein she told the dispatcher that Redding threatened her with a steak knife.  The record shows Appellant was present for the first 911 call, but not the second 911 call.

20

the defense tactics to be employed with which appellant and his present counsel now disagree, does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.

*Lewis v. State*, 246 Ga. 101, 105 (3) (268 SE2d 915) (1980). Consequently, Appellant has failed to show deficient performance under *Strickland*.

(iv) *Redding recordings.*

Appellant alleges that trial counsel was ineffective for failing to tender into evidence and play for the jury recordings seized from Appellant's home, which purportedly included previous threats made by Redding. Appellant asserts that these recordings would have further supported his theory of self-defense. The trial court found, and the record shows, that most of the recordings seized by law enforcement officers were on a broken digital memory card and could not be played. Appellant testified at the motion for new trial hearing that he had no recollection as to the dates that these recordings were made. Finally, as found by the trial court, the one recording that was functional and was played at the motion for new

21

trial hearing "revealed that [Appellant] was threatening Redding and [that] Redding intended to defend himself." Based on the foregoing, we agree with the trial court that Appellant has failed under *Strickland* to show a reasonable probability that the outcome of his trial would have been different had the one functioning recording been played at his trial. See *Doricien v. State*, 310 Ga. 652, 657 (4) (853 SE2d 120) (2020) ("The failure of trial counsel to employ evidence cannot be deemed to be 'prejudicial' in the absence of a showing that such evidence would have been relevant and favorable to the defendant." (Citation and punctuation omitted.)).

(b) *Plea offer.*

Next, Appellant asserts that trial counsel was ineffective for failing to timely advise him that the State had extended a plea offer and to explain the consequences of accepting a guilty plea versus going to trial, specifically by not describing the differences in parole eligibility between murder and voluntary manslaughter. However, counsel testified at the motion for new trial hearing that the State never made an offer for Appellant to plead guilty to voluntary

22

manslaughter. Counsel testified that the State's offer was for Appellant to plead guilty to murder and receive life with the possibility of parole, that she relayed the State's plea offer to Appellant, that Appellant fully understood the plea offer, and that he made it "abundantly clear" to her that he was not interested in accepting a plea offer both prior to and during trial. The trial court credited this testimony in support of its determination that counsel adequately explained the State's plea offer to Appellant. Giving the proper deference to the trial court's factual findings and credibility determinations, we agree that Appellant has failed to show deficient performance under *Strickland* on this claim. See *Jones*, 287 Ga. at 272 ("The trial court was authorized to credit the testimony of [appellant's trial] counsel, and its factual findings and credibility determinations will be accepted unless clearly erroneous." (Citation and punctuation omitted.)).

(c) *Bench trial.*

Finally, Appellant alleges that trial counsel was ineffective for failing to explain the option of having a bench trial. However,

23

Appellant has failed to establish prejudice because he offered no evidence that the State would have consented to a bench trial in this case. See *Smith v. State*, 295 Ga. 120 (757 SE2d 865) (2014) (upholding this Court's decision in *Zigan v. State*, 281 Ga. 415 (638 SE2d 322) (2006), that the State must consent to a bench trial). Accordingly, the trial court did not err in concluding that Appellant failed to show prejudice under *Strickland*.

4. Lastly, Appellant argues that he is entitled to a new trial on the basis of cumulative prejudice pursuant to *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020). However, because Appellant has not raised any trial court evidentiary errors and has only argued the cumulative effect of multiple alleged deficiencies on the part of trial counsel, *Lane* does not apply. See *Woods v. State*, ___ Ga. ___, ___ (3) (a) n.7 (___ SE2d ___) (2021) (Case No. S21A0862). Nonetheless, this Court assesses prejudice based on the cumulative effect of all of trial counsel's deficiencies. *Debelbot v. State*, 305 Ga. 534, 544 (2) (826 SE2d 129) (2019). "It is the prejudice arising from counsel's errors that is constitutionally relevant, not that each

24

individual error by counsel should be considered in a vacuum." (Citation and punctuation omitted.) *Davis v. State*, 306 Ga. 140, 150 (3) (j) (829 SE2d 321) (2019). Here, "we conclude that the cumulative prejudice from any assumed deficiencies [in Division 3 (a) (ii) and (iv) and 3 (c)] is insufficient to show a reasonable probability that the results of the proceedings would have been different in the absence of the alleged deficiencies." *Snipes v. State*, 309 Ga. 785, 798 (3) (f) (848 SE2d 417) (2020). Consequently, Appellant is not entitled to relief on this basis.

*Judgment affirmed. All the Justices concur.*

Decided September 8, 2021 — Reconsideration denied October 5, 2021.

Murder. Chatham Superior Court. Before Judge Morse.

*David T. Lock*, for appellant.

*Shalena Cook Jones, District Attorney, Margaret H. DeLeon, Amanda M. McCool, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.