314 Ga. 167
FINAL COPY

S22A0413. PATTERSON v. THE STATE.

LaGrua, Justice.

Appellant James Patterson was convicted of felony murder in connection with the beating death of Jeffrey Burke.[1] In this appeal, Appellant contends that: (1) he received constitutionally ineffective assistance of counsel; (2) the trial court erred in permitting a witness to be impeached under OCGA § 24-6-609 ("Rule 609"); and (3) a new trial is warranted due to newly discovered evidence. For the reasons explained below, we affirm.

1. The evidence at trial showed that on June 17, 2018,

---

[1] Burke was beaten on June 17, 2018, and he died following complications of his injuries on September 9, 2018. On December 18, 2018, a Bibb County grand jury indicted Appellant for malice murder, felony murder, and aggravated assault "by beating [Burke] with his hands and feet." At a trial from August 27 to 28, 2019, the jury found Appellant not guilty of malice murder but guilty of the remaining counts. Appellant was sentenced to serve life in prison for felony murder, and the aggravated assault count was merged for sentencing purposes. Appellant filed a timely motion for new trial. After holding two hearings in May 2021, the trial court denied the motion for new trial. Appellant filed a timely notice of appeal, and the case was docketed to this Court's April 2022 term and submitted for a decision on the briefs.

Appellant's mother and stepfather hosted a cookout attended by Appellant and approximately 20 family members and friends. Jeremiah Thomas drove Burke, Arthur Ross, and Frances Simmons to the cookout in his truck.

According to Ross, after a few hours, Burke and Appellant began arguing in the front yard about who was going to pay for the alcohol. Simmons came out of the house with to-go plates, and Ross asked Burke to take the to-go plates to Thomas's truck because they were preparing to leave the cookout. Simmons then returned inside. Ross then witnessed Appellant hit Burke. Burke "spun around and fell," and Appellant and another man began "kicking him and stomping him." Burke was "l[y]ing down, flat on his face, on his stomach, right there by [Thomas's] truck, on the concrete." Ross testified that Appellant then "went back up toward the street and c[a]me back down, had his pistol in his hand, and went to talking, y'all get on away from here before I kill him and all that." Burke then sent someone to retrieve Thomas and Simmons from inside the house.

In contrast to Ross's testimony, Appellant's three cousins — Melissa Rozier-Fleming, Darrell Rozier, and Kevin Rozier — testified that Burke stumbled down the stairs, fell forward, and hit Thomas's truck. They did not witness anyone assault Burke. Rozier-Fleming and Kevin further testified that they did not see Appellant with a gun that day.[2]

Simmons and Thomas testified that when they came outside, they saw Burke lying on the ground and bleeding from his face. Thomas asked Burke what happened, but Burke did not answer. They helped Burke into Thomas's truck. Ross called Burke's wife, Beverly Burke, but was unable to reach her. Ross eventually spoke to Burke's brother, Johnny Burke, who said to bring Burke home. At Burke's home, an ambulance was waiting, and it transported him to the hospital. Beverly testified that she asked Ross, Thomas, and Johnny how Burke was injured, and "they said that he fell."

Burke's doctor at the hospital testified: "The report that I got was that [Burke] had sustained significant facial and neck trauma.

---

[2] Darrell was not asked whether he witnessed Appellant with a gun.

3

They weren't sure how. They thought, possibly, that he got hit by a car, but there was really no clear indication of what had happened, other than he was hurt." The doctor further testified that Burke had numerous injuries to his head, neck, and spine that were consistent with both "being struck by an automobile" and "being kicked repeatedly about the head and body." Burke had three surgeries to treat his spinal injuries, but his lower extremities were paralyzed.

Beverly testified that when she visited Burke in the hospital, he told her: "[H]e had fixed him a plate to take home and . . . somebody hit him . . . came up behind him and hit him in the eye with a butt of a gun and he fell to the ground." He also said, "[T]wo or three people [were] kicking him."

A law enforcement officer reported to the hospital to take Burke's statement, and the encounter was recorded by the officer's body camera. The recording shows Burke lying in the hospital bed and two male visitors sitting in chairs. The officer testified that one of the visitors was Ross but did not name the other visitor. The officer asked Burke what happened, and he stated that he put two

4

to-go plates in the truck, and "the next thing [he] kn[ew]," he was "blacked out." After Burke described his injuries, one of the visitors in the room said something inaudible. Burke then stated that he "can't say how [the assailant] hit [him]."[3] Rather, he "t[hought] what [the assailant] did – [the assailant] got mad [be]cause [the assailant] wanted to bet [him] . . . wanted to bet on the shots of liquor," and Burke refused. Burke continued that "[the assailant] got mad" and "was drinking a big old bottle of wine," and Burke told the assailant that he "[did not] want to bet." The assailant then "knocked him out" while he was putting the to-go plates in the truck. The officer testified that a different law enforcement officer obtained the arrest warrant for Appellant.

Johnny testified that the day after Burke's assault, he saw Appellant and asked, "[D]id you see what happened, what happened to my brother?" Appellant responded, "[I]s that your brother?" When Johnny stated, "[Y]eah, that's my brother," Appellant said, "[W]ell,

---

[3] On the recording, Burke only refers to the assailant as "he," without identifying him by name or otherwise.

you need to tell your brother to keep his damn mouth shut."

Approximately two months after the assault, Burke was released from the hospital in a wheelchair and neck brace and with a catheter for urination. Burke's doctor testified that the type of paralysis that Burke had could result in a "neurogenic bladder"—meaning the person lacks bladder control requiring the use of a catheter for urination. The doctor further testified that the failure to maintain a catheter could result in pyelonephritis also known as a kidney infection. He testified that he believed the nurses provide discharge instructions to patients on how to maintain the catheter and observe it for signs of infection.

Beverly testified that she received training on how to empty the catheter and clean it. She further testified that she cleaned the catheter every time she emptied it and every time she gave Burke a bath, so it was cleaned "at least . . . twice a day."

Several weeks after Burke returned home, his daughter discovered him slumped over, not moving. Beverly attempted CPR, which was unsuccessful. She then called 911, but the EMTs were

unable to resuscitate Burke. Beverly testified that all of Burke's injuries and medical issues were a result of the June 2018 assault.

According to the medical examiner, Burke's medical records showed that he was a victim of a physical assault; he was diagnosed with a traumatic rupture of the right eye, surrounding lacerations or tears of the skin around this eye, skull fractures around this eye, a spinal cord injury of the neck, and fractures of the first three cervical vertebrae. She stated that Burke's injuries were "very localized, which would not be consistent with being struck by a vehicle." Additionally, when asked whether Burke's injuries were "consistent with . . . someone stumbl[ing] and hit[ting] their head on a truck," the medical examiner testified that she "would expect in that case [that] there would be injuries at the site of impact, either facial or skull injuries, but the severe injuries that involved, also, the entirety of [Burke's] cervical or neck vertebrae in the spinal cord would not be consistent with it." She testified that instead Burke's injuries were consistent with someone who had been repeatedly kicked in the head and body.

The medical examiner also testified that Burke's medical records showed he had surgery to stabilize the cervical vertebrae and to relieve pressure on the spinal cord due to "decreased movement of the upper and lower extremities." And she noted during the autopsy that he had "evidence of surgical hardware involving the cervical vertebrae or the neck vertebrae." Additionally, Burke's catheter was in-place when he arrived at the medical examiner's office. The medical examiner testified that Burke's medical records showed that he had a "dysfunctioning bladder," meaning that his "bladder would not contract properly on its own in order for him to urinate." She found evidence of a bacterial infection in both of Burke's kidneys and his bladder, and there was evidence of decreased kidney function. The medical examiner testified that Burke's cause of death was "[c]omplications of the acute pyelonephritis, [4] due to the urinary retention, due to the spinal cord injury, which was due to an assault," and that Burke's paralysis

---

[4] The medical examiner testified that acute pyelonephritis is a bacterial infection of the kidneys.

directly and materially contributed to the pyelonephritis because it was the cause of the urinary retention.

2. Appellant contends he received constitutionally ineffective assistance of counsel in multiple ways. To prevail on these claims, Appellant must demonstrate that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Sullivan v. State*, 308 Ga. 508, 510 (2) (842 SE2d 5) (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Appellant must show that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

> is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [Appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent

attorney would have followed such a course.

*Vann v. State*, 311 Ga. 301, 303 (2) (857 SE2d 677) (2021) (citations and punctuation omitted).

To establish prejudice, Appellant must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different. See *Sullivan*, 308 Ga. at 510 (2). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). "And, this burden is a heavy one." *Bates v. State*, 313 Ga. 57, 62-63 (2) (867 SE2d 140) (2022*)* (citation and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. at 63 (2).

(a) Appellant contends his trial counsel was ineffective for failing to argue proximate cause and for failing to request a jury instruction on proximate cause and intervening cause. Ineffectiveness claims must be raised and pursued at the earliest practicable moment, which for a claim of ineffective assistance of

trial counsel is at the motion for new trial stage if the defendant is no longer represented by the attorney who represented him at trial. See *Moore v. State*, 311 Ga. 506, 513 (6) (858 SE2d 676) (2021). Because Appellant did not do so here, as explained below, Appellant forfeited this claim of ineffective assistance.

At the motion-for-new-trial hearing, Appellant, who was represented by new counsel, asserted he was asking for a new trial on the bases "outlined in [the] amended motion for new trial." Additionally, the parties agreed to file post-hearing briefs after preparation of the motion-for-new-trial transcript. In the motion for new trial, amended motion for new trial, supplemental brief in support of the amended motion for new trial, and post-hearing brief in support of the amended motion for new trial, Appellant identified several claims of ineffective assistance of counsel; however, none of these claims involved a contention that his trial counsel provided ineffective assistance by failing to argue proximate cause to the jury or by failing to request a jury instruction on proximate cause and intervening cause.

11

Appellant directs us to some of the questions asked of trial counsel at the motion-for-new-trial hearing, arguing that his claim has been properly preserved based on appellate counsel's questioning. However, questioning during the motion-for-new-trial hearing, by itself, is insufficient to amend a motion for new trial to add a claim where the trial court did not rule on the claim. See *Smith v. State*, 310 Ga. 790, 796 (4) (854 SE2d 721) (2021) ("[T]he trial court's failure to address the ineffectiveness claim in its ruling on the motion meant that there was no implicit amendment [by the questioning at the motion-for-new-trial hearing] and that there was no ruling on the issue for this Court to review." (citation and punctuation omitted)). And in the order denying the motion for new trial, the trial court addressed Appellant's ineffectiveness claims, but not an ineffectiveness claim concerning the failure to argue proximate cause or failure to request a jury instruction on proximate cause.

Accordingly, we conclude Appellant failed to raise this ineffectiveness claim in his motion for new trial or at the motion-for-

new-trial hearing. Thus, Appellant forfeited this ineffectiveness claim. See *Elkins v. State*, 306 Ga. 351, 361 (4) (a) (830 SE2d 217) (2019) (an ineffectiveness claim must be raised in a motion for new trial or at the motion-for-new-trial hearing or else it is waived when the appellant is represented by new counsel at the motion-for-new-trial stage).

(b) Appellant contends his trial counsel provided ineffective assistance by failing to thoroughly cross-examine Beverly on any cleaning instructions she was given regarding the catheter and her method of cleaning the catheter. In its order denying Appellant's motion for new trial, the trial court found that the decision of Appellant's trial counsel "to take it easy on [Beverly] because he did not want to be seen as attacking a sympathetic witness" was a strategic decision and did not constitute ineffective assistance of counsel. As explained below, we agree.

At the motion-for-new-trial hearing, Appellant's trial counsel acknowledged that he "treaded lightly with [Beverly] because of just the sensitive nature of the trial" and "the strategy was to not come

13

across as a jerk [to] this widow." Indeed, in his closing argument, trial counsel stated, "I didn't want to be a jerk and beat [Beverly] up on the stand, but I think [Burke's doctor] stated that the catheter has to be properly cared for, otherwise, it could lead to that particular illness." Appellant's trial counsel elicited testimony from Burke's doctor that the failure to maintain a catheter could lead to a kidney infection.

As we have explained,

[t]rial tactics or strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them. More specifically, decisions about what particular questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel.

*Watts v. State*, 308 Ga. 455, 460 (2) (841 SE2d 686) (2020) (citation and punctuation omitted). And "the degree to which an attorney chooses to cross-examine witnesses and the manner in which to attack their credibility fall within the ambit of trial tactics." *Lawrence v. State*, 274 Ga. 794, 795 (3) (560 SE2d 17) (2002) (citation and punctuation omitted).

14

We cannot say that Appellant's trial counsel's decision to not question Beverly further was patently unreasonable given that she gave no indication that she failed to properly care for Burke's catheter and there was no evidence presented at trial or at the motion-for-new-trial hearing that Beverly improperly cleaned the catheter. See *Johnson v. State*, 310 Ga. 685, 691 (3) (853 SE2d 635) (2021) (Appellant failed to show deficient performance under *Strickland* where he "does not explain, and the record does not show, how [the] cross-examination would have been particularly helpful to him"). Accordingly, Appellant has failed to show deficient performance, and this claim fails.

(c) Appellant contends his trial counsel was deficient for failing to review discovery with him prior to trial. At the motion-for-new-trial hearing, Appellant testified that his trial counsel reviewed the police report with him, but did not review any other discovery. But in its order denying Appellant's motion for new trial, the trial court noted that Appellant's trial counsel "testified that he reviewed all discovery with [Appellant], including the incident report, witness

statements, and the medical examiner's report." The trial court's finding is supported by the testimony of Appellant's trial counsel at the hearing. The trial court implicitly credited the testimony of Appellant's trial counsel over Appellant on this issue. See *Anthony v. State*, 311 Ga. 293, 297 (3) (857 SE2d 682) (2021) (in the absence of explicit credibility findings by the trial court, we presume implicit findings were made supporting the trial court's decision). And the trial court was entitled to do so. See *Miller v. State*, 295 Ga. 769, 772 (2) (a) (i) (764 SE2d 135) (2014) ("The trial court was entitled to believe counsel's testimony he consulted with his client over appellant's testimony that he did not." (citation and punctuation omitted)).

Appellant has failed to demonstrate that counsel was deficient in reviewing discovery with him prior to trial. Accordingly, this claim fails.

(d) Appellant contends his trial counsel was deficient by failing to relay a plea offer to him. In its order denying Appellant's motion for new trial, the trial court found that Appellant's trial counsel

16

"testified that there were no negotiations to convey to [Appellant] as the State's recommendation was a life sentence [with the possibility of parole], which was also the minimum sentence that [Appellant] could receive at trial, and that the State refused to reconsider its recommendation when counsel attempted negotiations." Moreover, Appellant's trial counsel testified that, "[I]f I'm not mistaken, I would have — I know I would have told [Appellant] that the deal is life [with the possibility of parole]" and "I would like to say I [conveyed the plea offer], because the plea negotiations from the outset were always life, with the possibility of parole."

Even assuming without deciding that a plea offer existed and that trial counsel was deficient for failing to relay the plea offer, Appellant has not demonstrated prejudice because the sentence under the plea offer was the same as the sentence Appellant actually received, i.e., life in prison with the possibility of parole. See *Jacobs v. State*, 306 Ga. 571, 574 (2) (a) (832 SE2d 363) (2019) ("Where a defendant alleges that a plea offer was not disclosed to [him], . . . [t]he defendant must show: . . . that the conviction or sentence, or

17

both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." (citations and punctuation omitted)). Accordingly, this claim fails.

(e) Appellant contends his trial counsel failed to properly advise him of his right to testify and if he was so informed, he would have testified. In its order denying Appellant's motion for new trial, the trial court found that both Appellant's trial counsel and the court explained Appellant's right to testify to him.

Appellant's trial counsel testified at the motion-for-new-trial hearing that at trial he explained to Appellant that he had a right to testify.[5] Prior to the presentation of the defense witnesses, the trial court also engaged in an extended on-the-record colloquy with Appellant concerning his right to testify. During this colloquy, Appellant stated that he understood he had the right to testify and that if he wanted to testify, no one could prevent him from doing so.

---

[5] When questioned at the hearing on whether he was informed that he had the right to testify, Appellant stated, "I mean, I did [sic], but he told me not to. He told me it wouldn't be a smart idea if I testified." He further testified that had he been fully informed of his right to testify, he would have chosen to testify.

After Appellant stated he did not want to testify, he affirmed twice that this was his decision.

"It is well settled that defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Adams v. State*, 298 Ga. 371, 373 (2) (b) (782 SE2d 36) (2016) (citation and punctuation omitted). In order to succeed on this claim, Appellant "must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct." *Goodson v. State*, 305 Ga. 246, 249 (2) (824 SE2d 371) (2019) (citation and punctuation omitted).

As explained above, Appellant's trial counsel testified at the motion-for-new-trial hearing that he explained to Appellant that he had the right to testify, and some of Appellant's testimony at the hearing indicates that his trial counsel actually discussed the right to testify with him. The trial court implicitly credited the testimony of Appellant's trial counsel over Appellant on this issue, and it was

19

entitled to do so. See *Miller*, 295 Ga. at 772 (2) (a) (i).

Appellant has failed to demonstrate that his trial counsel performed deficiently by failing to properly advise him of his right to testify. Accordingly, this claim fails.

(f) Appellant contends that his trial counsel failed to present his stepfather, Dale Gilmore, and Deputy James Heidenreich as witnesses and that his trial counsel "failed to adequately investigate" Darrell prior to trial. In its order denying Appellant's motion for new trial, the trial court ruled that the testimony of Gilmore and Deputy Heidenreich would have been cumulative and therefore trial counsel was not deficient in failing to call them as witnesses. The trial court also ruled that "trial counsel was able to explain his actions in preparing witnesses for trial and that counsel's performance fell within the range of reasonable professional assistance."[6]

Deputy Heidenreich testified at the motion-for-new-trial

---

[6] While the trial court acknowledged that Appellant "complain[ed] that trial counsel failed to interview . . . Darrell," the trial court did not make any specific findings or rulings concerning Darrell.

20

hearing that he was dispatched to the hospital "in reference to a pedestrian hit by a vehicle." When he arrived, he spoke to a nurse, who stated that Burke was getting a CT scan. The nurse informed Deputy Heidenreich of Burke's injuries and stated that he was "extremely intoxicated." Deputy Heidenreich then spoke to Beverly, who told him that one of Burke's friends "had brought [Burke] to their house and told her that he had fell and hit his head on a truck." Deputy Heidenreich left the hospital without speaking to Burke, turned his report over to a supervisor, did not do any further investigation, and was never contacted by Appellant's trial counsel.

When questioned about why he did not present Deputy Heidenreich as a witness at trial, Appellant's trial counsel testified, "I think [Appellant] had spoken to . . . Heidenreich and he had mentioned to . . . Heidenreich that he wasn't at the cookout that day. I can't recall it vividly, but one of the initial reports that I read talked — mentioned . . . a statement about not being at the incident location." He also testified that

the only thing I would have wanted out of Heidenreich

21

was [that Burke's statement regarding what happened] wasn't reliable because he was inebriated. That's the point, all I wanted Heidenreich for. . . . I specifically remember wanting to make sure that was out so we could argue it in closing, was that basically [Burke] wouldn't have known what happened to him based on his level of intoxication.

Appellant's trial counsel later acknowledged that Deputy Heidenreich's testimony was cumulative of other evidence at trial; however, he also testified, "[T]o be candid with the [c]ourt, I don't know if that was in my mind" when he decided not to present him as a witness.

Regardless of the reason why trial counsel chose not to call Deputy Heidenreich, it is clear that his proposed testimony — that he was dispatched to the hospital "in reference to a pedestrian hit by a vehicle," that a nurse told him that Burke was "extremely intoxicated," and that Beverly told him that Burke's friends told her that he had been hit by a car — would have been hearsay. And Appellant has not demonstrated that Deputy Heidenreich's proposed testimony would have been admissible at trial. Accordingly, we conclude Appellant has failed to carry his burden to

22

demonstrate that counsel performed deficiently by failing to call Deputy Heidenreich as a witness. See *Mosby v. State*, 300 Ga. 450, 454 (2) (796 SE2d 277) (2017) ("Deficient performance of counsel is not shown by trial counsel's failure to present a witness whose testimony would have been inadmissible.").

Regarding Gilmore, he testified at the motion-for-new-trial hearing that he hosted the cookout, Appellant is his stepson, and he did not see Appellant get into a verbal or physical altercation with Burke. He further testified that Burke was drunk and staggering, and he "fell right there by the truck." Gilmore also stated that he never spoke to Appellant's trial counsel about the case.

Appellant's trial counsel testified at the motion-for-new-trial hearing that he did not call Gilmore as a witness because his testimony "would have been cumulative" and he did not want to "burden the jury with cumulative evidence." As we stated above, Rozier-Fleming, Darrell, and Kevin each testified that Burke fell and hit his head on a truck. Rozier-Fleming and Kevin also testified that Burke was intoxicated, and Rozier-Fleming testified that Burke

23

was stumbling before he fell. Thus, Gilmore's testimony would have been cumulative evidence. Accordingly, we conclude Appellant has failed to carry his burden to demonstrate that his trial counsel performed deficiently in failing to present Gilmore as a witness. See *Lewis v. State*, 312 Ga. 537, 544-545 (3) (a) (ii) (863 SE2d 65) (2021) (the appellant failed to show that his trial counsel was ineffective by failing to present a witness where that witness's testimony would have been cumulative of other evidence presented at trial).

Regarding Darrell, he testified at the motion-for-new-trial hearing that "he was contacted the day of trial and did not speak to [Appellant's trial counsel] nor anyone from his office." However, a review of the motion-for-new-trial transcript reveals that Darrell actually testified that Appellant's trial counsel personally contacted him the day before he testified, and they discussed that Darrell would need to testify. Indeed, Darrell testified favorably for Appellant at trial.

At the motion-for-new-trial hearing, Appellant failed to question his trial counsel about when he first contacted Darrell or

why he failed to contact him earlier.[7] "[W]hen trial counsel does not testify at the motion[-]for[-]new[-]trial hearing about the subject, it is extremely difficult to overcome the presumption that his conduct was reasonable." *Merritt v. State*, 310 Ga. 433, 436 (2) (a) (851 SE2d 555) (2020) (citation and punctuation omitted). Without trial counsel's testimony or some other evidence explaining trial counsel's decision, Appellant cannot show that it was patently unreasonable not to contact Darrell earlier, particularly because he appeared at trial and testified favorably for Appellant. See id. Accordingly, we conclude Appellant has failed to carry his burden to demonstrate that his trial counsel performed deficiently by failing to speak to Darrell earlier than the day before trial.

(g) Appellant contends his trial counsel was deficient by failing to retain and present an expert witness because "[t]here was testimony that [Burke] was in a coma and experts could determine any residual effects of head trauma and medications," and the

___

[7] Appellant's trial counsel testified that he spoke to Appellant's mother "a lot" and she told him who was present at the cookout.

medical examiner and Burke's doctor "had differing opinions as to the source of the injuries arising from a fight or hitting a vehicle."[8] Thus, Appellant contends "[a] defense expert would have provided a third opinion and additional insight to [Burke's] recollection for jurors to consider."

Assuming without deciding that Appellant's trial counsel was deficient for failing to retain and present an expert witness regarding Burke's injuries and cause of death, Appellant has not shown that, had an expert witness been hired, the result of his trial would have been different. Appellant failed to present an expert witness to testify at the motion-for-new-trial hearing to substantiate his claim that the witness's testimony would have been relevant and favorable to his defense. Therefore, Appellant has failed to show that there is a reasonable probability the result of his trial would have been different because there is no evidence as to how a potential

[8] As noted above, the evidence at trial actually showed that the doctor testified that Burke's injuries were consistent with both "being struck by an automobile" and "being kicked repeatedly about the head and body." In contrast, the medical examiner testified only that Burke's injuries were consistent with being kicked repeatedly about the head and body.

expert witness would have testified. See *Hughes v. State*, 289 Ga. 98, 100 (3) (709 SE2d 764) (2011). Accordingly, this claim fails.

(h) In his brief, Appellant also asks "[w]hether an attorney who . . . files no pretrial motions, demands, requests or other documents . . . has performed his duties in an unreasonable manner, rendering his representation ineffective?" and answers "[y]es." Appellant does not say anything else. Assuming without deciding that this generalized claim of ineffective assistance of counsel was properly raised before the trial court, this claim is deemed abandoned under Supreme Court Rule 22. See *Seabrooks v. State*, 306 Ga. 670, 671 (2) (832 SE2d 847) (2019) (ineffective-assistance-of-counsel claims are deemed abandoned where the appellant's claim "includes no meaningful argument or analysis and no citations of relevant authority").

3. Appellant contends that the trial court erred by allowing the State to impeach Darrell with a 2007 conviction for possession of cocaine under Rule 609.[9] A trial court's decision under Rule 609 is

---

[9] Rule 609 (a) (1) and (b) provide:

27

reviewed for an abuse of discretion. See *Anderson v. State*, 307 Ga. 79, 84 (3) (b) (834 SE2d 830) (2019). Assuming without deciding that Appellant objected to the admission of the conviction, and assuming without deciding that the trial court abused its discretion in allowing the State to impeach Darrell with the conviction, we turn to whether any such error was harmless.

"The test for determining nonconstitutional harmless error is

---

(a) General rule. For the purpose of attacking the character for truthfulness of a witness:

(1) Evidence that a witness other than an accused has been convicted of a crime shall be admitted subject to the provisions of Code Section 24-4-403 if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting the evidence outweighs its prejudicial effect to the accused[.]

. . .

(b) Time limit. Evidence of a conviction under this Code section shall not be admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for such conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old, as calculated in this subsection, shall not be admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

28

whether it is highly probable that the error did not contribute to the verdict." *Henderson v. State*, 310 Ga. 708, 713 (3) (854 SE2d 523) (2021) (citation and punctuation omitted). "In the context of Rule 609, error is harmless if the witness' credibility was sufficiently impeached by other evidence, or if the [State's] case was strong enough to support a conviction even apart from the witness' testimony." *Brown v. State*, 307 Ga. 24, 30 (3) (834 SE2d 40) (2019) (citation and punctuation omitted).

Here, when the prosecutor asked Darrell about the conviction, Darrell denied that the conviction was his, stated that the signature on the conviction was not his, and further stated that the conviction belonged to his cousin with the same name. The State did not prove otherwise, and the conviction was not admitted into evidence. Darrell's credibility was also impeached when he admitted during cross-examination that he was aware that his cousin had been arrested and charged with assaulting Burke and he did not contact the Sheriff's Department or the District Attorney and tell them that Appellant did not assault Burke and that he had witnessed Burke

29

fall. The prosecutor used Darrell's testimony during closing argument when he argued, "[N]one of [Appellant's three cousins] bothered to go to the [p]olice [s]tation and tell them what they saw, that they had a man locked up who did [not] do it and they know it, because they saw it." And the prosecutor never mentioned Darrell's alleged conviction during his opening statement or closing argument. See *United States v. Lewis*, 364 Fed. Appx. 606, 609 (11th Cir. 2010) (whether the prosecutor mentions the conviction "in opening or closing statements" is relevant to the harmless error analysis). Further, Darrell's testimony was cumulative of that of Rozier-Fleming and Kevin. Thus, Appellant has not carried his burden to show that the State's attempted impeachment of Darrell probably affected the outcome of the trial. Accordingly, this claim fails.

4. Appellant contends that the trial court abused its discretion in denying his motion for new trial based on newly discovered evidence in the form of a photograph showing Burke lying next to a truck. To obtain a new trial under OCGA § 5-5-23 based on newly

30

discovered evidence, a defendant must show the six factors of the

*Timberlake*[10] test:

> [F]irst, that the evidence came to his knowledge after his trial; second, that the failure to discover the evidence sooner was not due to his lack of due diligence; third, that the evidence is so material that it would probably produce a different verdict; fourth, that the evidence is admissible and not cumulative only; fifth, an affidavit of the witness or an explanation for its absence; and sixth, that the effect of the evidence would be more than to impeach the witness's credibility.

*Williams v. State*, 312 Ga. 195, 196 (862 SE2d 108) (2021).

At the motion-for-new-trial hearing, Appellant testified that on the day Burke suffered his injuries, he was intoxicated and he fell. Appellate counsel marked a photograph as Exhibit C and showed it to Appellant. Appellant testified that the photograph showed "Burke l[y]ing right there by his truck." He further testified that he and his family did not have access to the photograph at the time of trial, and it was provided after trial. When Appellant was asked whether he and his family attempted to get evidence of what occurred that day, he responded, "Yeah. They were trying to get everybody that was

---

[10] *Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980).

there to let everybody know that that's what happened. But we didn't even know nothing about a picture." Appellant's trial counsel testified, "[A]fter the trial was over, I did receive an avalanche of information and pictures and whatnot." In the order denying the motion for new trial, the trial court explained the photograph depicted Burke "wearing a white shirt and dark or black sweatpants, lying face down beside a grey truck" and determined the photograph was "not inconsistent with the State's theory or the testimony of the State's witnesses" and was "merely cumulative" and therefore could not "form the basis for granting a new trial."

Assuming without deciding that Appellant has satisfied the first two requirements of the six-part *Timberlake* test, we address the third and fourth requirements (cumulativeness and materiality), which were the bases for the trial court's decision. The photograph only shows Burke lying face down by a truck. Thus, the photograph is not so material that it would probably produce a different verdict. See, e.g., *Swinson v. State*, 311 Ga. 48, 58 (4) (855 SE2d 629) (2021) (evidence is not material where it does not

32

undermine the State's theory of the case and is consistent with other testimony), disapproved on other grounds, *Outlaw v. State*, 311 Ga. 396, 401 (2) (b) n.5 (858 SE2d 63) (2021). Moreover, all the witnesses testified that Burke was lying face down beside a truck after he was either attacked or fell. Thus, the evidence is cumulative of their testimony. Because the alleged newly discovered evidence was both not material and cumulative, the trial court did not abuse its discretion in denying the motion for new trial.

5. Finally, we consider whether the cumulative effect of presumed errors by trial counsel and the trial court entitles Appellant to a new trial. See *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020) ("We hold that the proper approach [to assessing trial court evidentiary errors] . . . is to consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel."). Here, the cumulative prejudice from any assumed deficiencies discussed in Divisions 2 (d) and (g) — failing to relay the plea offer (which caused no prejudice) and failing to retain and present an expert

witness (for which no prejudice was established) — and Division 3 — the attempted impeachment of a cumulative witness with a conviction (for which there was minimal prejudice) — is insufficient to show a reasonable probability that the results of the proceeding would have been different in the absence of the alleged deficiencies.

*Judgment affirmed. All the Justices concur, except Colvin J., disqualified.*

Decided June 30, 2022.

Murder. Bibb Superior Court. Before Judge Mincey.

*Nyonnohweah S. Seekie*, for appellant.

*Anita R. Howard, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.