320 Ga. 825
FINAL COPY

S24A0994. SMITH v. THE STATE.

LaGrua, Justice.

A jury convicted Nemiyas Smith of murder, aggravated assault, and related charges for shooting Kornelius Favors and Constance McCier, who was wounded.[1] Smith claimed self-defense

---

[1] The shooting occurred on March 22, 2019. On June 25, 2019, a Fulton County grand jury indicted Smith on the following counts: malice murder of Favors (Count 1); felony murder predicated on the aggravated assault of Favors (Count 2); felony murder predicated on Smith's possession of a firearm as a convicted felon (Count 3); aggravated assault of Favors (Count 4); aggravated assault of McCier (Count 5); aggravated battery of McCier (Count 6); possession of a firearm during commission of a felony, predicated on the charges of murder, felony murder, aggravated assault with a deadly weapon, and aggravated battery (Count 7); and possession of a firearm by a convicted felon (Count 8). Smith was tried in November 2021, and the jury convicted him on all counts. The trial court sentenced him to life in prison on Count 1 (malice murder); 20 years to serve on Count 6 (aggravated battery of McCier), consecutive to Count 1; five years to serve on Count 7 (possession of a firearm during commission of a felony), consecutive to Count 6; ten years to serve on Count 8 (possession of a firearm by a convicted felon), concurrent with Count 1, for a total of life in prison plus 25 years. The remaining counts merged or were vacated by operation of law. Smith timely filed a motion for new trial through trial counsel, who simultaneously moved to withdraw. New counsel filed an amended motion for new trial, which the trial court heard over two days, June 13, 2023, and June 26, 2023. The trial court denied Smith's motion for new trial on October 17, 2023. Smith filed a timely notice of appeal to this Court on October 30, 2023, and his case was docketed to this Court's August 2024 term and submitted for a decision on the briefs.

at trial. On appeal, Smith argues ineffective assistance of counsel on the grounds that Smith's trial counsel did not: (1) present an expert witness to establish that two different guns fired the two bullets which killed Favors; (2) object to the State's improper closing argument regarding felony murder and felon in possession of a firearm; and (3) object to allegedly false evidence and argument that Smith's brother, Neddrick, was a defendant in another murder case. Smith also contends that the State's presentation of such purportedly false evidence and argument about Neddrick is reversible error independent of the ineffective assistance of Smith's trial counsel. For the reasons that follow, we affirm.

The evidence presented at trial showed that, on the day of the shooting, McCier and Favors, who was McCier's boyfriend and the father of her child, went to "Rico['s] house"[2] to buy marijuana. McCier testified that she and Favors encountered Smith walking down the sidewalk in front of the house. McCier met Smith in the

---

[2] According to the record, Rico was the "street name" for a local drug dealer who sold drugs out of this location, which may have been a "rooming house." The record does not reflect Rico's legal name.

street while Favors and Rico stood in Rico's driveway. McCier asked Smith about a dispute that Smith and her brother Camerion were having. McCier testified that she and Smith engaged in a "peaceful conversation," where "basically [Smith] just told [McCier] about what happened."

McCier and Smith spoke for "about a minute or two" before Favors "walked up and immediately started talking." Favors also asked Smith about "the issue between [Smith] and Camerion," but, McCier testified, Favors "kind of" had an attitude. McCier said that she did not mean that Favors "came at [Smith] wrong," but that Favors "was just loud about the situation." McCier testified that Smith and Favors started "going back and forth," cursing at each other "a little bit," and that "both of them w[ere] hostile." McCier told Favors to "chill," because he "grabbed" at his fanny pack, which she knew contained a gun. McCier said she "didn't know [Favors's] intention," so she tried to "diffuse [sic] the situation by calming [Favors] down at the moment." McCier testified that Favors never took anything out of his fanny pack and that Favors calmed down at

her request. According to McCier, Favors said to Smith, "my bad, bruh," and Smith replied, "all right, suh" — "suh" referring to McCier as "sister" — and then Smith "just walked away." McCier said she and Favors then "walked back into the driveway with Rico," where they talked for a "few minutes," and Favors purchased marijuana from Rico.

McCier testified that Smith came back within "maybe three minutes at the most," with his brother Neddrick walking behind him. At that point, Favors had finished the marijuana purchase and turned to leave as McCier continued talking to Rico. McCier said that Favors got "a couple of steps" away from her and then "screamed" her name. McCier said that she "began to run to" Favors, thinking Favors "was calling [her] because [Favors] was ready to go." She did not know whether Rico was walking with them or stayed where he was; she "only remember[ed Favors] calling [her] name and then shots were fired."

McCier testified that when Favors called her name, Smith was on the sidewalk near McCier, Favors, and Rico; Favors and Smith

4

were walking "towards each other"; and McCier "instant[ly]" heard gunshots. McCier testified that she saw Smith's "hand out," but she did not see the gun in Smith's hand. McCier further testified that she did not "know who shot [her]," but she knew "that bullets w[ere] coming from [Smith's] direction." On redirect-examination, McCier said that she saw a gun in Smith's hand but she "didn't see the type of gun," and she heard "at least five" shots.

McCier said that she was shot in the arm as she and Favors ran away, and that, as she ran down the street, Smith ran past her and got into the car of "a friend of his[.]" McCier said that she realized that Favors had been shot "when [Favors] screamed [her] name again," and she saw Favors lying on the ground. McCier testified that Smith's brother, Neddrick, was "right there when [Smith] shot [her]," but she did not see Neddrick holding a firearm. McCier said that Favors never drew his gun or fired any shots, and she denied ever seeing Rico with a gun.

When City of Atlanta police officers arrived at the scene, they encountered McCier with an apparent gunshot wound to her upper

5

left arm. They found Favors lying "face down on the ground," with an apparent gunshot wound to his back. The officers secured the scene, and EMS transported McCier and Favors to Grady Hospital, where Favors died two days later. City of Atlanta Police Detective Tracy Casey went to Grady Hospital to interview Favors and McCier. Detective Casey testified that she could not take a statement from Favors because he was not "verbal . . . conscious or alert." Detective Casey testified that McCier told her the following:

McCier and Favors were "walking to purchase some marijuana" when they "ran into [Smith]." McCier said that she "was asking [Smith] why was he messing with her brother," but McCier said that the conversation "wasn't a confrontation. They weren't arguing or anything else like that." McCier said that Favors "interjected himself into . . . the conversation and basically said that . . . 'that's my family and you're not going to mess with my family,' or something to that extent."

McCier told Detective Casey that "within five minutes," as McCier and Favors were "making a transaction" with Rico, "they

6

s[aw] [Smith] coming around the corner . . . . [Smith] just raised the gun and he just start[ed] firing at the crowd." McCier stated that Smith "brought his brother Ned[drick] with him." McCier said that she was shot, and that they were "all running away, including Rico."

Detective Casey testified that she also interviewed Trevor Kane, who owned a film studio located near the scene and whose surveillance camera recorded the only known video footage of the incident. Kane told her that he heard "about four" shots that day.[3]

Detective Casey testified that she obtained Rico's phone number from McCier and called him. Rico confirmed that he was at the scene, but otherwise "wasn't cooperative." Detective Casey testified that Rico "basically referred [Detective Casey] back to . . . [the] video [and] to talking to [McCier] and [to Smith]." Detective Casey never learned Rico's real name and was never able to locate him. McCier told Detective Casey that Rico was not one of the

---

[3] Kane testified at trial that he was in his studio and heard the gunshots, but that he did not see the shooting. He testified that he heard four shots and went outside but only surveyed the scene "from a distance." He could not recall if police had already arrived but remembered that "[a] lot of the neighborhood was outside."

shooters, and Detective Casey never considered Rico a suspect.

Mark Tanner, testifying as the State's firearms expert, identified the two bullets recovered during Favors's autopsy. Tanner labeled the bullets 2A and 2B respectively in his report, and those labels were used to refer to the bullets throughout trial. Tanner testified that bullet 2A was a "specific caliber" of 9mm, but Tanner "classified" bullet 2B "as a .38 because [he couldn't] designate a specific caliber."[4] Tanner testified that because item 2B was a .38 "class" bullet, it could also be a 9mm caliber bullet.

Defense counsel pointed out on cross-examination that Tanner's report appeared to indicate that bullets 2A and 2B came from two different weapons. Specifically, the report stated that

---

[4] Tanner testified at the hearing on Smith's motion for new trial that he listed 2B as a .38 "bullet," meaning .38 class, because he was unsure of the caliber, and

> the GBI, per policy, if we cannot determine what's called the specific caliber, we must provide the generic caliber for the class of that projectile . . . . [W]henever I provide .38 bullets, that indicates, per GBI policy, that I am unsure of the specific caliber, so therefore I am giving the class caliber. So, in short, I don't – I don't know if 2B is a 9mm or a .38 special or a .357 magnum. That's why I gave the .38 bullet.

bullet 2A "is consistent [with] being fired from 9mm-type weapons," while bullet 2B "is consistent with being fired from a Rossi and a Taurus .38 special and a .357 magnum revolver." When defense counsel asked Tanner whether that meant that the bullets were "two different types of bullets," Tanner responded that

> [i]t's possible. Okay? So the 2B I have classified as a .38 bullet, which is a class of projectiles. So .38 class ranges from .38 special, .357 magnum, 9mm, [.]380 auto. It's the general class of a bullet. Now, on 2A I have it listed as a 9mm. This is a specific caliber or a specific class of bullet, so I was able to narrow it down to a 9mm. Now, I give here two separate lists showing that one of them is consistent with being fired from revolvers and derringers and the other one is consistent with being fired from pistols. Because when I look at them, that's what I see at first glance and looking at the evidence itself individually . . . . So the last statement in both of these [lists] states that it's not – these lists are not intended to be an all-inclusive list. So could any of these other firearms be on either list, that is possible. But based on what I saw, this is the best list that I could provide.

The trial court permitted the jury to submit questions to the court to ask witnesses throughout the proceedings. The trial judge asked Tanner on behalf of the jury, after a sidebar with the

9

attorneys, "in your expert opinion could 2B bullet [sic] have been possibly fired from a 9mm pistol?" Tanner responded, "[i]t is possible, yes." The trial judge next asked for the jury, "[c]an a hollow point, described as the .38, be loaded with the 9mm full metal jacket in the same gun? Could both .38 and 9mm's be loaded in the same gun and fired by the same gun?" Tanner responded, "[y]es, they can, as long as they share the same cartridge case style. Kind of going back to the first question as well here, they would have to be the same cartridge case style for it to fit in the same firearm." Nevertheless, Tanner stated that the two bullets displayed an "insufficient amount [sic] of characteristics" to determine "whether they were fired from the same gun or not."

When defense counsel asked Tanner on recross-examination if firing two different bullets from the same gun could cause "some problems in the firing mechanism," Tanner responded that

> [i]t depends on how they are loaded into the gun. So if the bullet that I have classified as a .38, if it is, in fact, a 9mm, which I wasn't able to determine, possibility [sic] if it is a 9mm and it was loaded into the same gun as the other 9mm's, there wouldn't be any types of munition

10

malfunction or anything. However, if it were to, say, be loaded in a [.]380, there is potential. Because while [.]380s can be fired in a 9[mm], it's not the same caliber as the gun, so there is potential for issues. But it depends on how it's loaded.

Smith testified in his own defense at trial. He said that, on the day of the shooting, he decided to walk to the store to buy cigarettes. Smith said that moments after he left the store, he encountered McCier and Favors. Smith testified that McCier called out to Smith, then met Smith in the street, at which point McCier asked Smith "what's goin[g] on with you and Camerion?" Smith testified that he explained to McCier that Camerion had pulled a gun on Smith. Smith said that, as he was explaining the situation to McCier, Favors asked Smith "what['s] the pressure about, bruh?" Smith said that when he responded to Favors, "what [are] you talkin[g] about?" Favors replied "s**t, bruh, you f**k with my family . . . I kill somebody." Smith testified that Favors then pulled a gun "halfway out" of his fanny pack. Smith said that, "in the midst of it," McCier "turn[ed] around . . . [and] put her hand over [Favors's] mouth." Smith said that McCier told Favors that "Camerion [was the one in

11

the] wrong." Smith testified that Smith then "turned around and walked off." Smith said that Favors called out, "[d]on't let this happen no more." Smith said that he kept walking because he did not want to "get [himself] shot right there."

Smith testified that, as he walked away, he realized that he had forgotten his cigarettes at the store. Smith said that on his way back to the store, he saw McCier, Favors, and Rico standing together in Rico's driveway, and Favors "got the gun in the hand now." Smith testified that McCier "whispered" something to Favors and then called Smith over to them. Smith said that he went over to them, despite Favors openly holding a gun, because Smith wasn't "thinking." Smith also said he did not see the gun until he was too close to turn around and run without "get[ting himself] shot in the back." According to Smith, when he got "close to them, a shot [went] off." Smith testified that the three "rush[ed]" him, and Favors "jump[ed] towards" him. Smith said that when he heard the shot, he "jumped," "reached," and shot in return "boom — boom." Smith said he fired "not really trying to hurt nobody, just shoot, shoot."

Smith said there were four shots fired that day, the first one he only heard, the other three he fired. When asked who fired the first shot, Smith responded, "[t]o be honest, I don't know," but he reiterated that it came from the three others standing in a group, and he saw Favors holding a gun.

Smith denied ever seeing his brother Neddrick at the scene. Smith insisted that he came by himself and that he "was alone" "the entire time." When asked if the man standing behind him in the video was Neddrick, Smith replied, "I don't know."

Smith admitted that he shot Favors in the back so Smith could "get out [of] the driveway." When the State asked Smith, "you understand that you killed [Favors] by shooting him in the back when his back was turned," Smith responded, "Okay. That's the only — that's the only thing that matter[s]?" Smith later testified that Favors aimed a gun at him "even while [Favors] was running with his back to [Smith]" and that Favors was "still a threat" at that point.

During closing argument, defense counsel maintained that

Rico fired a .38 caliber revolver first, and that Smith returned fire in self-defense. Defense counsel reiterated that all the witnesses testified to hearing at least four shots, and that Favors exhibited three wounds and McCier one. Defense counsel argued that police officers only recovered three shell casings, all 9mm's fired from Smith's gun. Based on these facts, defense counsel argued that the fourth shot was the one to Favors's abdomen, which Rico must have fired from a .38 caliber revolver, and that the fact that it came from a revolver explained why police found no shell casing for it.

To support this theory, defense counsel cited to Tanner's report that bullet 2B was "consistent with being fired from a Rossi and Taurus .38 special . . . and . . . [a] .357 Magnum revolver." Defense counsel argued that the reference to "[r]evolver tells you there is no shell casing. The only shell casing[s] they see [are] his. They don't see the other shell casing because it was fired from a revolver." Defense counsel argued that the State "want[s] you to think that .38 came from a 9mm. It did not. The .38 came from a .38."

Defense counsel further argued that "[t]he only person

unaccounted for is Rico," which "would account for four [shots]." Defense counsel argued that "[i]t's not likely" that Smith shot Favors in the stomach because Favors's "back was turned when he was firing." Defense counsel pointed to the video of Rico at the scene, arguing that it showed him with a raised arm and then putting something in his pocket and "calmly walking away." Defense counsel argued that police never searched Rico's house because the State "wants you to forget about" Rico.

During the State's closing argument, the prosecutor referenced Tanner's opinion that bullets 2A and 2B "could not be identified or eliminated as having been fired from the same firearm due to a lack of sufficient individual characteristics," explaining that that meant "[i]nconclusive. Don't know." From there the State contended that

> [w]hat you do need to know is that the .38 is a class. [Tanner] went on and on about a class . . . . [A] .38 is a class of gun. And in that class falls a .38 caliber, a [.]380 and a 9mm caliber . . . . So it's a class and the 9mm falls under the class.

Finally, the State argued during its closing argument that Detective Casey heard about Neddrick from "a fellow detective [who]

was investigating Ned[drick] because Ned[drick] had his own open murder charge." The State further argued that Detective Casey did not reach out to Neddrick because he was Smith's brother, and

> what is Ned[d]rick really going to tell her? You[’re] right, my brother did it; [h]e shot him in cold blood. No, he's not going to tell them that. And based on that, what she already knows about Ned[d]rick and what she knows about the family. Ned[d]rick has his own open murder. He's not going to admit to anything, not going to tell them anything. And she also said that the Smith family was known to be difficult. She just left that one alone.

Defense counsel objected, saying that the State's argument was "[i]mproper character evidence through Ned[d]rick, talking about murders. He's not — Ned[d]rick is not on trial here." The trial court overruled the objection because "[t]hat is what Detective Casey testified to."

1. Smith claims that his trial counsel was constitutionally ineffective for failing to: (a) retain a firearms expert to establish that two different guns fired the two different bullets found in Favors; (b) object to the State's closing argument about felony murder; (c) object to purportedly false testimony; and (d) object to purportedly false

16

closing argument that Neddrick was a defendant in another homicide case, when he was only a witness. There is no merit to these contentions.

To prevail on a claim of ineffective assistance of counsel, Smith must establish that his attorney's performance was deficient and that deficient performance unduly prejudiced Smith's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "Because judicial scrutiny of counsel's performance is highly deferential, there is a strong presumption that a lawyer rendered reasonable professional assistance." *Espinosa v. State*, 320 Ga. 98, 102-103 (2) (907 SE2d 691) (2024) (citation omitted). Such presumption "is extremely difficult to overcome" where trial counsel fails to testify regarding his representation. *Patterson v. State*, 314 Ga. 167, 177 (2) (f) (875 SE2d 771) (2022) (citation and punctuation omitted). As for prejudice, Smith must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Strickland*, 466 U.S. at 694. If Smith fails to satisfy either prong of *Strickland*, this Court need not examine the other prong. See *Jessie v. State*, 294 Ga. 375, 377 (2) (754 SE2d 46) (2014).

(a) "Typically, the decision whether to present an expert witness is a matter of trial strategy that, if reasonable, will not sustain a claim of ineffective assistance." *Matthews v. State*, 301 Ga. 286, 289 (2) (800 SE2d 533) (2017). Moreover, Smith's trial counsel did not testify at the hearing on Smith's motion for new trial, making the "strong presumption" that counsel reasonably chose not to present an expert "extremely difficult to overcome." *Patterson*, 314 Ga. at 174 (2) (e), 177 (2) (f) (citations and punctuation omitted).

Tanner was equivocal in his opinion at trial, stating that the two bullets could have come from one gun or two, and could have been the same specific caliber or two different calibers. Smith's counsel examined Tanner at some length and, during closing argument, specifically cited Tanner's equivocal opinion and strategically used it to Smith's advantage. Even the State argued that Tanner's report was "[i]nconclusive," which meant the parties

"[d]on't know" what 2B's caliber was.

Given all of this, we cannot say that Smith has overcome the strong presumption that his trial counsel reasonably chose not to present an expert, and to instead cross-examine the State's expert and use that testimony to Smith's advantage, which means that Smith has not shown that his trial counsel was deficient. See *Matthews*, 301 Ga. at 289 (2) (holding that counsel's decision not to call a counter-expert was not deficient in part because counsel reasonably decided to "use cross-examination and argument to advance" her trial theory); *Stripling v. State*, 304 Ga. 131, 138 (3) (b) (816 SE2d 663) (2018) (holding that counsel was not deficient for failing to call an expert at trial in part because other evidence admitted at trial "was consistent with" the expert testimony the appellant could have presented); *Middlebrooks v. State*, 310 Ga. 748, 752 (3) (854 SE2d 503) (2021) (holding that trial counsel was not deficient for failing to call an expert on gang activity in part because "competent trial counsel" could impeach the gang evidence in other ways, "including by cross-examining the State's witnesses who

testified about gang activity and by" making appropriate argument to the jury). As such, this claim fails.

(b) Smith claims that his trial counsel was ineffective for failing to object to the State's closing argument that Smith was guilty of felony murder based on his possession of a firearm as a convicted felon.[5] Smith only raises this claim with respect to his felony murder count.

However, Smith's conviction for malice murder resulted in Smith's felony murder conviction being vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 373 (5) (434 SE2d 479) (1993) ("When valid guilty verdicts are returned on both alternative counts of malice and felony murder, the alternative felony murder count is

---

[5] The State told the jury:

Possession of firearm by a convicted felon. This is an easy one. If you find that the defendant committed the homicide at the time they were engaged in the commission of a felony, a possession of firearm by convicted felon, then you would be authorized to find the defendant guilty of murder, whether the homicide was intended or not. We know he was a convicted felon. He told you he was a convicted felon. He was not supposed to possess a firearm. And while he was possessing a firearm, someone died. Felony murder.

20

vacated by operation of OCGA § 16-1-7."). Thus, Smith's claim of ineffective assistance of counsel pertaining to the State's closing argument about felony murder is moot. See *Darville v. State*, 289 Ga. 698, 702 (4) (b) (715 SE2d 110) (2011) (holding that the appellant's contention that counsel was ineffective by failing to object to the omission of a particular jury instruction on felony murder was moot because the appellant was found "guilty of malice murder and no conviction was entered on the felony murder charge"); *Anthony v. State*, 311 Ga. 293, 299 (4) n.3 (857 SE2d 682) (2021) (holding that because no convictions were entered on the appellant's felony murder charges, "his ineffective assistance claims are moot to the extent they pertain to the portions of trial counsel's closing argument that reference felony murder") (citation omitted); *Sims v. State*, 312 Ga. 322, 330 (3) (862 SE2d 534) (2021) (holding that because no conviction was entered on the appellant's aggravated assault charge, "his ineffective assistance claim is moot to the extent that trial counsel's alleged ineffectiveness relates to that crime"); *Williams v. State*, 313 Ga. 325, 331-332 (4) (869 SE2d

369) (2022) (holding that a conviction of malice murder mooted any error in jury instructions regarding related felony murder and aggravated assault charges).

Therefore, this claim of error fails.

(c) Smith contends that trial counsel was ineffective for failing to object when Detective Casey testified that she never interviewed Neddrick about Favors's shooting because Neddrick was a defendant in another homicide case. Smith argues that Detective Casey's testimony was false because Neddrick was not a defendant, but only a witness in the other matter. We conclude that this contention fails.

In support of his argument, Smith points to two companion cases related to the shooting death of one victim. See *Stripling*, 304 Ga. at 132-134 (1) (a); *Smith v. State*, 306 Ga. 753, 757 (1) (a) (833 SE2d 117) (2019). Four Smith brothers, Neddrick, Nemiyas (appellant here), Talib, and Nierris, were in the vicinity of the shooting. A witness initially identified Neddrick as the shooter, whereupon police arrested and questioned Neddrick, but Neddrick was apparently never charged for the crime. The jury convicted

22

Talib Smith and two other people for the murder.

The extent of Detective Casey's testimony about Neddrick on direct examination was that, during her investigation, she discussed Smith's case with fellow City of Atlanta Police Detective Kevin Leonpacher. Detective Casey testified that Detective Leonpacher recognized Smith's name and "start[ed] researching names, and he pull[ed] up a case that he had prior to [Smith's] with [Smith's] brother Ned[d]rick." Detective Leonpacher gave Detective Casey Smith's date of birth, which Detective Casey used to access Smith's driver's license in order to confirm Smith's identity. Defense counsel subsequently cross-examined Detective Casey about her understanding of Neddrick's status as a witness to Favors's shooting without discussion of her choice not to interview Neddrick.

Detective Casey first testified about why she chose not to interview Neddrick when, after a sidebar with the attorneys, the trial court asked Detective Casey, on the jury's behalf, "[d]id you or other investigators get a statement from Ned? Ned[d]rick?" Detective Casey responded, "No." Detective Casey said nothing

23

further about the issue until later, when asked about it on redirect examination. Detective Casey testified that she did not attempt to talk to Neddrick because "Ned[d]rick had already been involved in quite a few different things." At that point defense counsel objected, but then, significant to our analysis, withdrew the objection. Detective Casey continued testifying that she did not investigate Neddrick

> [d]ue to the fact of, number one, like I testified before that investigator Leonpacher [had] a previous case with Ned[d]rick and he has also been a defendant in another homicide case, I didn't feel that it was going to be fruitful for me to have a conversation with Ned[d]rick. Because, again, this is [Smith's] brother, and I don't think that it would have been a — I don't think that it would have been a truthful conversation based upon the history of what I know of Ned[d]rick and the rest of the family. Also, because the mother was doing things as well[,] trying to involve herself in this investigation as well. So I didn't think that this would be a fruitful conversation to have with Ned[d]rick.

Defense counsel then attempted to impeach Detective Casey's testimony, including by pointing out that Neddrick remained at the scene of Favors's shooting and was "talking to the police after the fact." Detective Casey replied that, despite remaining at the scene,

24

Neddrick never gave police any statement about what happened, so he was "definitely not being a witness to tell what happened."

Under the circumstances of this case, we see no deficiency in trial counsel's decisions regarding Detective Casey and Neddrick Smith. Trial counsel objected to Detective Casey's testimony that she did not attempt to interview Neddrick because "Ned[d]rick had already been involved in quite a few different things," but then withdrew his objection. Counsel's decision to withdraw his objection and allow Detective Casey to explain that she did not interview Neddrick based, in part, on the information she received from Detective Leonpacher, enjoys the "strong presumption" of being a tactical decision, particularly in absence of trial counsel's testimony. See *Espinosa*, 320 Ga. at 102-103 (2); *Patterson*, 314 Ga. at 177 (2) (f). See also *Davis v. State*, 306 Ga. 140, 146 (3) (e) (829 SE2d 321) (2019) (holding that "whether to impeach prosecution witnesses and how to do so are tactical decisions") (citation and punctuation omitted). Trial counsel instead chose to cross-examine Detective Casey on this point, which, under the circumstances of this case, was

within the range of professional competence. See *Faust v. State*, 302 Ga. 211, 219 (4) (b) (805 SE2d 826) (2017) (holding that failure to object to a detective's testimony as improper bolstering because the testimony relied on the statements of other individuals for corroboration was not professionally deficient because trial counsel "attacked these portions of the detective's testimony on cross-examination"); *Bragg v. State*, 295 Ga. 676, 680 (4) (d) (763 SE2d 476) (2014) (holding that failure to object to the testimony of two investigators which relied on the hearsay testimony of another individual was not professionally deficient because "trial counsel attacked the agents' testimonies on cross-examination"). And, objective counsel could have reasonably decided, as a tactical matter, to let the jury hear from Detective Casey that Neddrick, who accompanied Smith to the scene, had been a defendant in another homicide case, allowing the jury to infer that Neddrick might have been the shooter instead of Smith. See *Chavers v. State*, 304 Ga. 887, 895 (4) (823 SE2d 283) (2019) (holding that competent counsel could decline to object to allegedly inadmissible testimony in an effort to

"support[ ] counsel's strategy of incriminating" someone other than the appellant).

(d) Smith also contends that his trial counsel failed to object to the prosecutor's closing argument that Neddrick had an "open murder" charge. However, trial counsel objected: "[i]mproper character evidence through Ned[d]rick, talking about murders. He's not — Ned[d]rick is not on trial here," and the trial court overruled the objection. Because counsel did object to the prosecutor's argument, "those statements cannot be the basis for an ineffective assistance claim." *Walker v. State*, 311 Ga. 719, 726 (4) (a) (859 SE2d 25) (2021) (citation omitted).

Smith's claims of ineffective assistance of counsel therefore fail.

2. Smith argues that the State knowingly elicited the purportedly false testimony and argument that Neddrick was a defendant in another murder case, though the record reflects that he was only a witness. Smith contends that misidentifying Neddrick as a defendant requires reversal of Smith's convictions

independently of his allegations of ineffective counsel.

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959).[6] See also *Byrd v. Owen*, 272 Ga. 807, 810 (1) (536 SE2d 736) (2000) (holding that "[a]ny conviction resulting from false testimony knowingly used by the State is incompatible with this country's standards of justice and justifies reversal"). To prevail on this claim, Smith must show that "(1) the prosecutor knowingly used perjured testimony or failed to correct what he [or she] subsequently learned was false testimony; and (2) such use was material[,] i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Harris v. State*, 309 Ga. 599, 607 (2) (c) (847 SE2d 563) (2020).

Smith does not contend that Detective Casey and the trial prosecutor had actual knowledge that Neddrick was a witness, but not a defendant, in the previous murder case. Rather, Smith

---

[6] We assume without deciding that *Napue* and its progeny apply here.

contends that the Atlanta Police Department and the Fulton County District Attorney's office, as respective entities, were aware that Neddrick was a witness, not a defendant, because both offices worked on the previous murder, and such knowledge is imputed to Detective Casey and the trial prosecutor by virtue of their working in those respective offices. See, e.g., *Giglio v. United States*, 405 U.S. 150, 154 (92 SCt 763, 31 LE2d 104) (1972) (holding that information one prosecutor has about a case may be imputable to a different prosecutor by virtue of working in the same office). See also *DeLoach v. State*, 308 Ga. 283, 293 (3) (b) (840 SE2d 396) (2020) (same).

Assuming without deciding that, under Smith's theory of imputed knowledge, Detective Casey and the prosecutor "knew" that Neddrick was not previously a homicide defendant, but they said he was anyway, any such falsehood was immaterial. Again, false testimony is material if it could "in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271. See also *Harris*, 309 Ga. at 607 (2) (c) (same). A determination of materiality requires an examination of the statements at issue in the context of

the entire record. See, e.g., *Hood v. State*, 311 Ga. 855, 864 (1) (860 SE2d 432) (2021) (holding that whether failure to disclose a witness's plea deal was material required the court to "examine the suppressed evidence in the context of the entire record").

Here, the video of the shooting, together with McCier's testimony, was highly consistent with a calculated murder and, conversely, highly inconsistent with Smith's self-serving recitation of facts in support of his claim of self-defense. Specifically, Smith returned to the scene three to five minutes after Favors allegedly brandished a weapon and allegedly threatened to "kill somebody," because Smith purportedly wanted to retrieve forgotten cigarettes. Similarly, Smith testified that he left the scene minutes before so as not to "get [himself] shot right there," but then admitted that he approached Favors despite seeing Favors with "the gun in the hand now," because Smith was not "thinking." The video shows Smith looking over his shoulder as he approaches Rico, McCier, and Favors. Smith then appears to walk slightly past the group before turning and raising his arm(s) in Favors's direction. At that

moment, Favors and McCier run. Smith admittedly shot Favors in the back as Favors ran away. McCier identified Smith as the only person who fired a weapon that day.

Thus, the evidence against Smith was very strong, meaning there is no reasonable likelihood that the statements about Neddrick affected the judgment of the jury, especially because Neddrick's purported criminal history was not relevant to Smith's claim of self-defense. See OCGA § 24-4-401 (providing that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Therefore, this enumeration also fails.

3. Finally, Smith argues that the above errors are cumulative and warrant reversal. Reversible cumulative error requires a showing that (1) at least two evidentiary errors, or one error and one deficient performance of counsel, were committed at trial, and that (2) those errors, considered along with the entire record, "so infected the jury's deliberation that they denied the petitioner a

fundamentally fair trial." *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020) (citation and punctuation omitted). However, we have only assumed an error regarding the State's implied knowledge about Neddrick's purported murder charge, and have discerned no other error. Therefore, there is no cumulative error to consider. See *Thomas v. State*, 311 Ga. 573, 579 (6) (858 SE2d 504) (2021) (holding that cumulative error analysis "does not apply when, as here, there are not multiple errors to consider cumulatively"). As such, this contention also fails.

*Judgment affirmed. All the Justices concur.*

Decided February 18, 2025.

Murder. Fulton Superior Court. Before Judge Ingram.

*Lauren B. Shubow*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Elaine L. Thompson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, M. Catherine Norman, Assistant Attorney General*, for appellee.