NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 10, 2025

S25A0256. COSTON v. THE STATE.

ELLINGTON, Justice.

A DeKalb County jury found Ladarion Tijuan Coston guilty of murder and other crimes in connection with the November 2020 shooting death of Caleb Simmons.[1] Coston contends the evidence

---

[1] The crimes occurred on November 29, 2020. On January 10, 2022, a DeKalb County grand jury indicted Coston and Marcus Yancey for the crimes of malice murder (Count 1); felony murder (Counts 2, 3, and 4); armed robbery (Count 5); aggravated assault (Count 6); possession of a firearm by a convicted felon (Counts 7 and 8); and possession of a firearm during commission of a felony (Counts 7). On July 28, 2023, a jury found Coston and Yancey guilty on all counts. The trial court sentenced Coston to life in prison without the possibility of parole for murder; life in prison without the possibility of parole for armed robbery, to be served consecutively to the sentence for murder; ten years in prison for possession of a firearm by a convicted felon, to be served consecutively to the sentences for murder and armed robbery; and five years in prison for possession of a firearm during commission of a felony, to be served consecutively to the sentences for murder, armed robbery, and possession of a firearm by a convicted felon. The felony murder counts were vacated by operation of law and the aggravated assault count was merged with the murder count. Coston filed a timely motion for new trial on August 22, 2023, which he amended on June 4, 2024. After a hearing on June 14, 2024, the trial court denied Coston's amended motion for new trial on July 26, 2024. Coston filed a timely notice of appeal on July 29, 2024. The case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

was constitutionally insufficient to support his convictions, his trial counsel provided constitutionally ineffective assistance, the trial court plainly erred in admitting certain evidence, and the cumulative effect of these errors warrants reversal. For the reasons explained below, we see no merit to these contentions and affirm.

1. The evidence, viewed in the light most favorable to the jury's verdicts, shows the following. On November 29, 2020, Coston and his co-defendant, Marcus Yancey, shot and killed Simmons while robbing him during a drug sale at the Avana City North apartment complex in DeKalb County. The immediate aftermath of the shooting was witnessed by Nickolas McKiness, who lived in the apartment complex near the mailbox area of the breezeway where the shooting occurred. While in his apartment, McKiness heard a gunshot. He opened his door, peered outside, and saw Simmons's body on the breezeway floor with blood beginning to pool around his head. Simmons's belongings were scattered around his body. McKiness called 911 at 2:19 p.m. to report the crime. About a minute after he heard the gunshot, McKiness observed a man running

2

toward the breezeway, shouting: "That's my brother!" The man knelt by Simmons's body and picked up cash, a bag, and a handgun. McKiness later identified this man as co-defendant Yancey.

Mikal Yamini, another resident of the apartment complex, drove into the complex's parking lot shortly after the shooting occurred. As he entered the parking lot, he saw a vehicle speeding out of the parking lot. Yamini also saw a man wearing a red and yellow track suit scale the fence surrounding the complex, struggle to get over the fence, and then run away. Yamini reported his observations to the police.

Police officers arrived at the apartment complex at 2:24 p.m. Witnesses directed the officers to the breezeway where Simmons's body lay, surrounded by shell casings and loose dollar bills. The officers obtained descriptions of the perpetrators from McKiness, Yamini, Yinessia Miller, and Drismia Yilla. Miller and Yilla did not testify at trial. The witnesses gave detailed descriptions of the men to the police, including descriptions of the clothing they wore. One of the men wore all black; the other wore a yellow and red tracksuit.

Eyewitness Yilla, whose statement was admitted at trial as an excited utterance, described the man in black clothing as having a small cheek tattoo that contained straight lines. After speaking with the witnesses, the officers noticed a blood trail and followed it for about 150 feet to a grassy area near the fence surrounding the complex. There they found a black bag that contained money and marijuana.

The medical examiner testified that Simmons died as a result of a gunshot wound to the head. He described a contact gunshot wound directly above Simmons's left eyebrow that indicated that the shooter had pressed his gun directly to Simmons's head when he fired it. Simmons also suffered a gunshot wound to his thigh.

Several days after Simmons's death, Simmons's family and friends went to the police station to provide information to investigators. Simmons's family gave the investigators images of Simmons's telephone call logs. The logs showed that, shortly before the shooting, Simmons had been communicating with someone calling from a phone number ending in -5834. This number had a

Memphis area code.

Simmons's friend, Erek Frye, told investigators that, two days before Simmons's murder, he and Simmons had met two men from Memphis who wanted to buy some marijuana. Frye testified that, while they were at the Shell gas station on Lavista Road, "two dudes approached us" to "buy some weed." During the encounter, the men obtained Simmons's phone number and "linked up with [Simmons] a few days after." Frye said the men were from Memphis. One of the men had a dreadlocks hairstyle and identified himself as "Black." Frye identified this person as Yancey. Frye was unable to identify Yancey's associate because the man wore a mask that covered his mouth and forehead. He recalled, however, that Yancey's associate wore a blue hat with the logo for the Kansas City Royals baseball team. Although Frye was unable to positively identify Coston at trial, he confirmed that the hat that the shooter was wearing in the surveillance video was the same hat he saw on the man who accompanied Yancey to the gas station two nights before the murder.

After the investigators obtained Simmons's cell phone records, they noticed that the phone number ending in 5834 was saved in Simmons's phone under the name: "Black." Investigators later identified the number as belonging to co-defendant Yancey. Simmons's cell phone records showed that he received an incoming call from Yancey's phone number at 1:46 p.m. on the day of the murder and then made an outgoing call to that number at 2:06 p.m., minutes before McKiness's 911 call.

Investigators also obtained a surveillance video recording from the apartment complex. The recording, which was shown to the jury, shows Yancey on the phone in the apartment breezeway. He is wearing a bright yellow top and red pants. While he is on the phone, Yancey walks near the mailboxes with Simmons. The video then shows Simmons opening a bag and displaying the contents to Yancey. Shortly thereafter, Yancey shows cash to Simmons. Seconds later, another man appears. He is wearing black pants, a black sweatshirt with an image on the front, and a blue baseball cap with a logo. Thirty-eight seconds later, the man draws a handgun from

his pants and points it at Simmons. Yancey follows suit, drawing his own weapon and pointing it at Simmons. As Simmons hands the cash to Yancey, the other man points his gun at Simmons's head. The other man then pushes Simmons, who turns and pushes (or is pushed into) Yancey. The other man grabs Simmons's arm, presses the gun to his head, and fires the weapon. Simmons collapses to the ground, and blood pools around his head. Yancey and the other man flee. Minutes later, Yancey reappears and takes items from and around Simmons's body, including a gun and the bag Simmons was carrying at the beginning of the video. Yancey then flees.

Investigators obtained an arrest warrant for Yancey on December 1, 2020, and he was arrested in Memphis on January 8, 2021. Following Yancey's arrest, investigators worked to identify the second man involved in the shooting. Investigators learned that the person Yancey spoke with on the phone immediately before the shooting used a phone number ending in -6256. A call was placed from that number to Yancey at 2:14 p.m. on November 29, 2020, five minutes before McKiness's 911 call reporting the shooting.

7

Investigators received information in August 2021 pointing them to a person known as "Snagg" or "Tijuan Broome," a known associate of Yancey's. Investigators viewed Snagg's Facebook page and saw an image of him wearing a sweatshirt that appeared to be the same sweatshirt that the second man wore in the surveillance video recording of Simmons's murder. Further investigations into Snagg's Facebook account revealed that the page was owned by Coston, whose middle name is Tijuan. In a series of Facebook messages to various people, Coston revealed his full name, date of birth, address, and partial Social Security Number. Coston also posted images of himself on November 15, 2020, showing a dollar-sign facial tattoo and a blue Royal's baseball hat and black sweatshirt like those seen in the surveillance video recording. Even after he was arrested, Coston kept his Facebook page and an Instagram profile active.

Coston's Facebook messages also showed he was in Atlanta at the time of the murder. On November 25, 2020, Coston responded to a message, stating that he was "Headed to the A," which an

investigator testified is slang for "Atlanta." On November 27, Coston told someone that he was "in the A[.]" And on November 28, Coston sent a message to another person, stating he was "way in the A wit[h] it." In December 2020, Coston provided his phone number to people on Facebook around 35 times. The cell phone number Coston provided was the same number that Yancey was communicating with at 2:14 p.m. on November 29, 2020, immediately before the shooting. Coston also posted multiple pictures of Yancey on his Facebook account. Further, Coston communicated with Yancey's relatives after Yancey's January 2021 arrest, referring to one of Yancey's relatives as "Ma" and telling another of Yancey's relatives: "Love you too, sis."

Investigators also obtained geolocation information for Yancey's and Coston's cell phone numbers. Both phones were in Memphis at 3:31 p.m. on November 25, 2020, and then traveled together through Birmingham, Alabama, and arrived in Tucker, Georgia at 11:38 p.m. Both phones were active in the Atlanta area over the next several days. At 2:14 p.m. on November 29, 2020,

9

Coston's phone called Yancey's phone. Coston's phone was then inactive until December 2, 2020, when the phone was back in Memphis. Yancey's phone was active in Atlanta at 5:00 p.m. on November 29, 2020, but then was inactive until November 30, 2020, at 1:16 p.m. when the phone was back in Memphis.

Following his arrest, Coston was photographed. The photograph shows that Coston has a dollar sign tattoo on his face with parallel lines in it.

Yancey testified at trial and he admitted being in Atlanta and arranging a drug sale with Simmons and Frye. Yancey said he contacted Simmons on November 29, 2020, and agreed to buy a pound of marijuana from Simmons for $2,500. Yancey said he got nervous when Simmons arrived at the apartment complex for the sale because Simmons had a gun. Moreover, when they began the transaction, "it was supposed to be a pound [of marijuana] in the bag, [but] there weren't no pound." Instead, Simmons only produced a few ounces of marijuana. These things allegedly prompted Yancey's "partner" to pull his gun. Yancey claimed that he drew his

10

gun after his partner "spazzed out" and Simmons reached for his own gun. Yancey claimed that he "blacked out" and ran off when the shooting occurred. But then he immediately returned to the breezeway because he believed that he had dropped his own gun and phone. He testified that he was "out of [his] mind" and "just picked up everything" that was lying by Simmons's body. Further, he testified that his partner was not Coston but instead a man named "Montrel Bland," who was deceased at the time of trial. When Yancey was shown a picture of Bland, who did not have a dollar-sign facial tattoo, he said that he did not know if Bland had a face tattoo because he "wasn't paying attention."

The parties stipulated that Coston was a convicted felon at the time of the crimes.

Coston contends this evidence was entirely circumstantial and did not exclude every other reasonable hypothesis except guilt, and therefore, is insufficient to prove his guilt of the crimes charged[2]

---

[2] OCGA § 16-5-1 (a) provides that: "A person commits the offense of murder when he unlawfully and with malice aforethought, either express or

beyond a reasonable doubt. We disagree. First, the evidence was not entirely circumstantial.[3] Therefore, we need not address whether the proved facts "exclude[d] every other reasonable hypothesis save that of [Coston's] guilt" of the crimes charged. OCGA § 24-14-6. See also *Jackson v. State*, 311 Ga. 626, 630 (2) (859 SE2d 46) (2021) ("[I]f there is any direct evidence presented by the State, the

___

implied, causes the death of another human being." "Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof." OCGA § 16-5-1(b). Malice is implied where "no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Id. OCGA § 16-8-41 (a) provides, in pertinent part, that a person commits the offense of armed robbery when "with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon." OCGA § 16-11-106 provides that a person commits the offense of possession of a firearm during the commission of a felony when that person has a firearm "on or within arm's reach of his . . . person . . . during the commission of . . . (1) any crime against or involving the person of another." Finally, OCGA § 16-11-131 (b) provides that a person commits the offense of possession of a firearm by a convicted felon when that person has been convicted of a felony by any court "of this state or any other state" and he receives, possesses, or transports a firearm.

[3] The evidence against Coston, a convicted felon, was not solely circumstantial. The surveillance video recording showing Coston shooting Simmons was direct evidence of Coston's guilt. See *Walker v. State*, 314 Ga. 390, 394 (2) (b) n.5 (877 SE2d 197) (2020) ("A video-recording of events alleged to depict a crime constitutes direct evidence of the crime."). "[I]t was for the jury to decide whether or not the [video recording] establish[ed] that [Coston]" was the person who shot Simmons. *Thomas v. State,* 296 Ga. 485, 487 (1) (769 SE2d 82) (2015). Additionally, the State submitted certified records – direct evidence – establishing that Coston was a convicted felon when he possessed the murder weapon. *Walker*, 314 Ga. at 394 (2) (b).

12

circumstantial evidence statute does not apply to a sufficiency analysis."). Second, sufficient evidence supported each of Coston's convictions.

When evaluating the sufficiency of the evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "[I]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." *Bamberg v. State*, 308 Ga. 340, 343 (1) (a) (839 SE2d 640) (2020) (citation omitted).

The State presented ample evidence from which the jury could find beyond a reasonable doubt that Coston, a convicted felon, robbed and murdered Simmons by shooting him with a handgun. The State presented the video-recording of the shooting as well as witness testimony and other evidence from which the jury could identify Yancy's partner as Coston.

For example, Yilla, an eyewitness, recounted seeing a small

13

tattoo on Yancey's partner's right cheek. The tattoo contained straight lines. The jury could have inferred that she was describing Coston's dollar-sign facial tattoo and that Yancey's testimony that his accomplice was Montreal Bland, who was deceased at the time of trial, was not credible given that Bland did not have a tattoo on his face. The State also presented evidence of Coston's Facebook profile, which displayed an image of his tattooed face as the profile picture and revealed other identifying information, including his birthdate. The Facebook profile also showed photographs of Coston wearing the same clothes, including the same distinctive sweatshirt and hat, that the second man wore in the video recording of the shooting. The State also presented evidence that Coston shared his phone number on Facebook – the same number that Yancey called minutes before the shooting. And Coston told his Facebook friends that he was in Atlanta between November 25, 2020, and November 29, 2020.

The State additionally presented phone records showing that Yancey communicated with the phone number ending in -6256 –

14

which the jury could have inferred was Coston's phone number –
immediately before Yancey's accomplice appeared in the
surveillance video. Further, records for the phone number ending in
-6256 show that the phone's user traveled to Atlanta with Yancey
four days before the shooting.

Viewing the evidence in a light most favorable to the verdicts
and deferring to the jury's assessment of the weight and credibility
of the evidence, we conclude that the evidence was sufficient to
authorize a rational trier of fact to find Coston guilty beyond a
reasonable doubt of the crimes of malice murder, armed robbery,
possession of a firearm by a convicted felon, and possession of a
firearm during the commission of a felony. See *Jackson*, 443 U. S. at
319 (III) (B). See also *Blackshear v. State*, 309 Ga. 479, 482-484 (847
SE2d 317) (2020) (concluding that the evidence was constitutionally
sufficient to authorize the defendant's malice murder conviction
where the forensic evidence linked the defendant to the victim and
the crime).

2. Coston contends that his trial counsel was constitutionally

15

deficient in two respects: (a) by allowing the admission of State's Exhibit 55, which he contends was "flagrantly prejudicial 404 (b) evidence"; and (b) by failing to impeach a State's witness with a prior unsworn statement.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was constitutionally deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (3) (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013) (citation omitted). See also *Strickland*, 466 U. S. at 687-688. This requires a defendant to overcome the strong presumption that trial counsel's performance was adequate. See *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015). "If an appellant

16

fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (2) (690 SE2d 801) (2010).

(a) State's Exhibit 55 is an affidavit attached to a search warrant. It describes a June 2021 shooting in the same apartment complex as the one at issue in this case and identifies Coston as a suspect. Trial counsel testified that she did not object to the exhibit being entered into evidence or seek redactions to it because no witness would testify about the contents of the affidavit and the affidavit would not accompany the jury into deliberations. In its order denying Coston's motion for new trial, the trial court determined that, although State's Exhibit 55 was entered into evidence, it "was never shown or published to the jury. This exhibit also never went back with the jury to be considered during their deliberations." The record shows that counsel knew the jury would not see or hear about the affidavit, and that is exactly what occurred. Under these circumstances, it would make no sense for counsel to

17

object, especially when objecting may have drawn the jury's attention to the affidavit. For these reasons, Coston has not shown that counsel's performance in this regard was deficient. See *Gittens v. State*, 307 Ga. 841, 847 (2) (e) (838 SE2d 888) (2020) (no showing of deficient performance where defendant failed to show that no competent attorney would have made the same decision).

(b) Coston contends that his trial counsel was deficient for failing to "impeach with statements of Yinessia Miller."[4] Miller, who did not testify, gave an unsworn written statement to the police. In that statement, Miller said she saw a man who was about five feet, seven inches tall walking around the apartment complex about 30 to 45 minutes before the shooting. Coston argues that Miller's statement would have corroborated Yilla's statement that the shooter was about five feet, six inches tall – shorter than Coston's five feet, eleven inches. During defense counsel's cross-examination

---

[4] Coston does not specify in his appellate brief which witness or witnesses should have been impeached with Miller's statements. Rather, Miller simply asserts that counsel should have sought to have Miller's statement admitted into evidence.

18

of an investigator, the investigator testified that Yilla described the shooter as being five feet, six inches tall, which is about five inches shorter than Coston. **«V3: 230»**

Coston has not carried his burden of showing that counsel was deficient in this respect. Miller did not testify at trial; Coston does not contend that defense counsel should have called Miller as a witness at trial; Coston has not identified any other person who could have been impeached with Miller's statement; and Coston has not made any argument demonstrating that Miller's statement would have been admissible at trial for any other purpose. Miller's statement is plainly "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). Therefore, Miller's statement was inadmissible hearsay unless an exception applied. See OCGA § 24-8-802. See also *Lopez v. State*, 311 Ga. 269, 273 (2) (a) (857 SE2d 467) (2021). Because Coston has not shown that Miller's statement would have been admitted at trial pursuant to any exception to the rule against hearsay, we can only

19

conclude that the statement was inadmissible. "And failing to introduce inadmissible evidence is not deficient performance." *Davis v. State*, 315 Ga. 252, 263 (882 SE2d 210) (2022) (citation omitted).

3. Coston contends that the trial court committed plain error in admitting State's Exhibit 55. State's Exhibit 55 is a search warrant and supporting affidavit seeking information from Yancey's social media account. Coston presents no argument concerning the admission of State's Exhibit 55. Therefore, any claim of plain error with respect to the admission of State's Exhibit 55 is deemed abandoned. See Supreme Court Rule 22 (1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned.").

Although Coston enumerated as error the admission of State's Exhibit 55, the substance of his argument appears to pertain to the trial court's ruling admitting in evidence Yilla's statement (which was not State's Exhibit 55) as an excited utterance. To the extent that Coston raises on appeal an argument that the trial court erred

20

in admitting Yilla's statement to police, the record shows the following. The State filed a "Motion to Admit Hearsay Evidence" pursuant to OCGA § 24-8-803, in which the prosecutor proffered that Yilla had moved out of state and that efforts to locate her and place her under subpoena had been unsuccessful. Further, Yilla's statement was made roughly 20 minutes after the murder and was made at the end of the breezeway where Simmons's body lay. The prosecutor contended that Yilla was "visibly shaken and breathing heavily and [made] several comments about being upset." At the pretrial hearing on the motion, the prosecutor added that Yilla's statement was made for the purpose of attempting to locate Coston, and that the officers issued a "BOLO" immediately after talking to Yilla and the other witnesses. Further, Yilla made her statement while "the victim [was] being actively worked on by EMS and [was] being moved to the ambulance." Defense counsel objected to the admission of the statement. After hearing arguments of counsel, the court ruled that the statement was admissible over objection as an excited utterance. The trial court reiterated its ruling in its written

21

order denying Coston's motion for new trial, finding that Yilla was unavailable and that her statement was admissible as an excited utterance.

We see no abuse of discretion in the trial court's ruling that Yilla's statement was admissible under the excited utterance exception to the rule against hearsay.[5] See *Lyons v. State*, 309 Ga. 15, 21 (4) (843 SE2d 825) (2020) ("The admission of evidence is committed to the sound discretion of the trial court, and the trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion."). As we have explained:

> The excited utterance exception says that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" shall not be excluded by the hearsay rule. OCGA § 24-8-803 (2). We have explained that "'the excited utterance need not be made

[5] Coston mistakenly contends the trial court's ruling should be evaluated for plain error. However, because the trial court definitively ruled that Yilla's statement was admissible over counsel's objection, Coston's claim of error was preserved for ordinary appellate review. See OCGA § 24-1-103 (a) ("Once the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal."). See also *Rashad v. State*, 318 Ga. 199, 209 (3) (897 SE2d 760) (2024).

22

contemporaneously [with] the startling event.'" *Robbins v. State*, 300 Ga. 387, 389 (793 SE2d 62) (2016) (quoting *United States v. Belfast*, 611 F3d 783, 817 (11th Cir. 2010)). Rather, the court should consider the totality of the circumstances in determining whether the statement was made while the declarant was "'still . . . under the stress or excitement that the startling event caused.'" *Robbins*, 300 Ga. at 389 (quoting *Belfast*, 611 F3d at 817 (citing cases affirming the admission as excited utterances of statements made even hours after the startling event)).

*Blackmon v. State*, 306 Ga. 90, 94-95 (829 SE2d 75) (2019) (footnote omitted).

Given the totality of the circumstances, the trial court did not abuse its discretion when it ruled that Yilla's statement was admissible. The record supports the court's finding that Yilla was unavailable for trial and that her statement was made under the stress of excitement caused by a shooting that she recently had witnessed. The trial court could reasonably find that the fatal shooting was a startling event. Moreover, the court could reasonably conclude that the "visibly shaken" Yilla was still under the stress of the event 20 minutes later, especially given that the shooter was still at large and Yilla made her statement while the victim was bleeding

23

to death in her presence. See *Munn v. State*, 313 Ga. 716, 725 (5)(873 SE2d 166) (2022) (Witnesses were still under the stress of the shooting, given that "the video recording shows that [they] were screaming and crying as they made their unsolicited statements; the statements were made approximately ten minutes after the shooting, while [the victim] was still on the scene bleeding to death[.]");*Varner v. State*, 306 Ga. 726, 732 (2) (b) (ii) (832 SE2d 792) (2019) (Witness statements on police recording were excited utterances because "stress and excitement caused by the shooting had not yet dissipated" when "police officers responded just minutes after the shooting, and [the victim] was still bleeding profusely as he waited for an ambulance."). See also *Belfast*, 611 F3d at 817-818 (VI) (A) (Statement was an excited utterance even when made four to five hours after the startling event because the victim was unable to leave the place where the event occurred and thus likely continued to experience trauma from the incident.).

4. Lastly, Coston contends that the "cumulative prejudice of multiple errors is sufficiently harmful to warrant a new trial[.]" To

establish reversible cumulative error, Coston was required to show that "(1) at least two evidentiary errors, or one error and one deficient performance of counsel, were committed at trial, and that (2) those errors, considered along with the entire record, 'so infected the jury's deliberation that they denied [Coston] a fundamentally fair trial.'" *Smith v. State*, 320 Ga. 825, 839 (912 SE2d 563) (2025) (quoting *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020)). However, Coston has not carried his burden of showing that at least two such errors were committed during his trial. Consequently, this claim of error fails. See *Henderson v. State*, 318 Ga. 752, 76059 (3) (900 SE2d 596) (2024).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*

25